AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Central District of California

<div style="border:1px solid">
FILED
CLERK, U.S. DISTRICT COURT

**3/17/21**

CENTRAL DISTRICT OF CALIFORNIA
BY: ___ DEPUTY
</div>

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) | Case No. 2:21-MJ-01302 |
| 9182 W. OLYMPIC BLVD., | ) | |
| BEVERLY HILLS, CALIFORNIA | ) | |
| | ) | |
| | ) | |
| | ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 371, 1343, 1956; 21 U.S.C. §§ 841, 846; 31 U.S.C. §§ 5324 and 5331. | See affidavit |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of_____days *(give exact ending date if more than 30 days:_____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s Lynne Zellhart
_____
*Applicant's signature*

Special Agent Lynne Zellhart, FBI
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: March 17, 2021
_____

_____
*Judge's signature*

City and state: Los Angeles, CA

Hon. Steve Kim, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA Andrew Brown, x0102, 11th Floor

## EXHIBIT A

**7**

**ATTACHMENT A - USPV**

The premises to be searched is:

The storefront located at 9182 W. OLYMPIC BLVD., BEVERLY
HILLS, CALIFORNIA, which houses the businesses known as Olympic
Gold & Jewelry and U.S. Private Vaults in a single retail space
with only one entrance.  The premises to be searched is a retail
space in a strip mall located on the south side of Olympic Blvd.
between S. Palm Drive and S. Oakhurst Drive.  It bears the
current street number "9182" over the glass entry door on the
left side of the space, and the former street number "9186"
towards the right.  Above the premises to be searched on the
stucco wall is the sign "US PRIVATE VAULTS" in red and blue
letters.  The front of the premises to be searched is all glass,
some of it darkly tinted.  The glass windows bear the additional
signs "OLYMPIC GOLD & JEWELRY" and "US PRIVATE VAULTS."  The
premises to be searched is between the stores "Silver Nails" to
the east and "Mail Service" to the west, and is pictured in the
attached photographs:

1

**EXHIBIT A**
**8**





2

**EXHIBIT A**
**9**

<u>**ATTACHMENT B--USPV**</u>

I.   **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of <u>18 U.S.C. §§ 371</u>, <u>1343</u>, and <u>1956</u>; <u>21</u> U.S.C. §§ 841, 846; and <u>31 U.S.C. §§ 5324</u> and <u>5331</u> (money laundering, distribution of controlled substances, wire fraud, structuring, and conspiracy to commit the same) (the "SUBJECT OFFENSES"), namely:

a.   Narcotics and controlled substances, such as cocaine and THC, and related paraphernalia such as scales, pay-owe sheets, packaging material such as vape cartridges, and documents referring or relating to them, such as their manufacture or sale, or maintaining premises for the same;

b.   Records referring or relating to countersurveillance of law enforcement, obstructing investigations, warning persons of law enforcement inquiries or activities such as serving subpoenas or search warrants, or hiding, altering, or destroying evidence;

c.   Money counters, cash over $10,000, bitcoin and other digital currency as well as related documents and programs, and records referring or relating the preceding items or to IRS form 8300, Currency Transaction Reports and other Bank Security Act (BSA) requirements, currency reporting requirements generally, structuring transactions to circumvent those requirements, such as instructions to keep transactions under $10,000 in cash, anti-money laundering programs and how to evade them, investigations by financial institutions and the closure or threatened closure of financial accounts, and, since 2019, records of cash payments and receipts;

**EXHIBIT A**
**10**

d.    Firearms, ammunition, and related paraphernalia such as holsters and magazines, and records referring or relating to the same;

e.    Documents and records referring or relating to actual or threatened violence, such as those to enforce a criminal debt;

f.    Documents and records referring or relating to the conversion of cash to financial instruments such as checks and wire transfers, and vice versa, for a percentage of the dollar value converted, including such conversions when there is an intermediate medium such as precious metals, whether real or purported;

g.    Records reflecting or relating to the escheatment of property to the state of California including the requirement to do so, returning property to a named designee, the disposition of contents of abandoned/unpaid safety deposit boxes, and complaints that items were missing from a safety deposit box;

h.    Records referring or relating to criminals, crimes, prison, arrests, criminal investigations, criminal charges, and asset forfeiture;

i.    Biometric scanning equipment and records, and documents referring or relating to them;

j.    Digital or video security systems, recordings of forcing open safety deposit boxes and the removal of contents of boxes for any purpose including abandonment or incapacity of the customer and documents referring or relating to the same, and, since 2019, surveillance video;

k.    Nests of safety deposit boxes and keys, and documents and records referring or relating to them since 2019.  This warrant does not authorize a criminal search or seizure of the contents of

2

**EXHIBIT A**
**11**

1  the safety deposit boxes.  In seizing the nests of safety deposit
2  boxes, agents shall follow their written inventory policies to
3  protect their agencies and the contents of the boxes.  Also in
4  accordance with their written policies, agents shall inspect the
5  contents of the boxes in an effort to identify their owners in order
6  to notify them so that they can claim their property;

7          l.    Records referring or relating to CARES Act relief
8  programs, such as the Paycheck Protection Program and Small Business
9  Administration loans;

10          m.    Records referring or relating to the ownership or
11  control of U.S. PRIVATE VAULTS or OLYMPIC GOLD & JEWELRY or parent or
12  subsidiary entity, including employment records, and records of
13  corporate actions such as corporate minutes and votes;

14          n.    Since 2019, documents and records referring or
15  relating to financial or monetary transactions involving U.S. PRIVATE
16  VAULTS or OLYMPIC GOLD & JEWELRY, including records referring to or
17  identifying their customers;

18          o.    Records referring or relating to Beltran or a cartel,
19  or since 2019 to MJ Real Estate Investors Inc. (MJRE), Emerald Fund
20  LLC, Alta Quality Growers, MGP Management, MGP Consulting, MGP
21  Filling and Packaging, Bachelor Valley Fund LLC, Antares Topanga
22  Group LLC, dba Valley Collective Care, Rogue Bioscience, and
23  Sportsware Inc.;

24          p.    Records relating to wealth and the movement of wealth
25  since 2019, such as tax returns and forms, crypto-currency accounts
26  and transfers, other digital wealth storage and transfer methods
27  including PayPal and Venmo, money orders, brokerage and financial
28  institution statements, wire transfers, currency exchanges, deposit

**EXHIBIT A**

1  slips, cashier's checks, transactions involving prepaid cards, and/or
2  other financial documents related to depository bank accounts, lines
3  of credit, credit card accounts, real estate mortgage initial
4  purchase loans or loan refinances, residential property leases,
5  escrow accounts, the purchase, sale, or leasing of automobiles or
6  real estate, or auto loans, and investments, or showing or referring
7  to purchases or transactions for more than $1,000;

8          q.   Records or items containing indicia of occupancy,
9  residency or ownership of any location or vehicle being searched,
10  such as keys, rental agreements, leases, utility bills, identity
11  documents, cancelled mail, and surveillance video;

12          r.   Documents and records showing electronic and telephone
13  contacts and numbers called or calling, such as SIM cards, address
14  books, call histories, telephone bills, and Signal, ICQ, Telegram,
15  and email addresses.

16          s.   Any digital device which is itself or which contains
17  evidence, contraband, fruits, or instrumentalities of the Subject
18  Offenses, and forensic copies thereof.

19      2.   With respect to any digital device containing evidence
20  falling within the scope of the foregoing categories of items to be
21  seized:

22          a.   evidence of who used, owned, or controlled the device
23  at the time the things described in this warrant were created,
24  edited, or deleted, such as logs, registry entries, configuration
25  files, saved usernames and passwords, documents, browsing history,
26  user profiles, e-mail, e-mail contacts, chat and instant messaging
27  logs, photographs, and correspondence;

28

4

**EXHIBIT A**
**13**

b.     evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.     evidence of the attachment of other devices;

d.     evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

e.     evidence of the times the device was used;

f.     passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

g.     applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

h.     records of or information about Internet Protocol addresses used by the device;

i.     records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

3.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

**EXHIBIT A**
**14**

1      4.   As used herein, the term "digital device" includes any

2  electronic system or device capable of storing or processing data in

3  digital form, including central processing units; desktop, laptop,

4  notebook, and tablet computers; personal digital assistants; wireless

5  communication devices, such as telephone paging devices, beepers,

6  mobile telephones, and smart phones; digital cameras; gaming consoles

7  (including Sony PlayStations and Microsoft Xboxes); peripheral

8  input/output devices, such as keyboards, printers, scanners,

9  plotters, monitors, and drives intended for removable media; related

10  communications devices, such as modems, routers, cables, and

11  connections; storage media, such as hard disk drives, floppy disks,

12  memory cards, optical disks, and magnetic tapes used to store digital

13  data (excluding analog tapes such as VHS); and security devices.

14  **II.   SEARCH PROCEDURE FOR DIGITAL DEVICES**

15      5.   In searching digital devices or forensic copies thereof,

16  law enforcement personnel executing this search warrant will employ

17  the following procedure:

18      a.   Law enforcement personnel or other individuals

19  assisting law enforcement personnel (the "search team") will, in

20  their discretion, either search the digital device(s) on-site or

21  seize and transport the device(s) and/or forensic image(s) thereof to

22  an appropriate law enforcement laboratory or similar facility to be

23  searched at that location.  The search team shall complete the search

24  as soon as is practicable but not to exceed 120 days from the date of

25  execution of the warrant.  The government will not search the digital

26  device(s) and/or forensic image(s) thereof beyond this 120-day period

27  without obtaining an extension of time order from the Court.

28

<div align="center">6</div>

1      b.    The search team will conduct the search only by using
2  search protocols specifically chosen to identify only the specific
3  items to be seized under this warrant.

4           i.    The search team may subject all of the data
5  contained in each digital device capable of containing any of the
6  items to be seized to the search protocols to determine whether the
7  device and any data thereon falls within the list of items to be
8  seized.  The search team may also search for and attempt to recover
9  deleted, "hidden," or encrypted data to determine, pursuant to the
10  search protocols, whether the data falls within the list of items to
11  be seized.

12          ii.   The search team may use tools to exclude normal
13  operating system files and standard third-party software that do not
14  need to be searched.

15          iii. The search team may use forensic examination and
16  searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit),
17  which tools may use hashing and other sophisticated techniques.

18     c.    If the search team, while searching a digital device,
19  encounters immediately apparent contraband or other evidence of a
20  crime outside the scope of the items to be seized, the team will not
21  search for similar evidence outside the scope of the items to be
22  seized without first obtaining authority to do so.

23     d.    If the search determines that a digital device does
24  not contain any data falling within the list of items to be seized,
25  the government will, as soon as is practicable, return the device and
26  delete or destroy all forensic copies thereof.

27     e.    If the search determines that a digital device does
28  contain data falling within the list of items to be seized, the

7

**EXHIBIT A**
**16**

1   government may make and retain copies of such data, and may access
2   such data at any time.

3            f.   If the search determines that a digital device is (1)
4   itself an item to be seized and/or (2) contains data falling within
5   the list of other items to be seized, the government may retain the
6   digital device and any forensic copies of the digital device, but may
7   not access data falling outside the scope of the other items to be
8   seized (after the time for searching the device has expired) absent
9   further court order.

10           g.   The government may also retain a digital device if the
11  government, prior to the end of the search period, obtains an order
12  from the Court authorizing retention of the device (or while an
13  application for such an order is pending), including in circumstances
14  where the government has not been able to fully search a device
15  because the device or files contained therein is/are encrypted.

16           h.   After the completion of the search of the digital
17  devices, the government shall not access digital data falling outside
18  the scope of the items to be seized absent further order of the
19  Court.

20      6.   The review of the electronic data obtained pursuant to this
21  warrant may be conducted by any government personnel assisting in the
22  investigation, who may include, in addition to law enforcement
23  officers and agents, attorneys for the government, attorney support
24  staff, and technical experts.  Pursuant to this warrant, the
25  investigating agency may deliver a complete copy of the seized or
26  copied electronic data to the custody and control of attorneys for
27  the government and their support staff for their independent review.
28

8

**EXHIBIT A**
**17**

1      7.   In order to search for data capable of being read or
2 interpreted by a digital device, law enforcement personnel are
3 authorized to seize the following items:

4      a.   Any digital device capable of being used to commit,
5 further, or store evidence of the offense(s) listed above;

6      b.   Any equipment used to facilitate the transmission,
7 creation, display, encoding, or storage of digital data;

8      c.   Any magnetic, electronic, or optical storage device
9 capable of storing digital data;

10      d.   Any documentation, operating logs, or reference
11 manuals regarding the operation of the digital device or software
12 used in the digital device;

13      e.   Any applications, utility programs, compilers,
14 interpreters, or other software used to facilitate direct or indirect
15 communication with the digital device;

16      f.   Any physical keys, encryption devices, dongles, or
17 similar physical items that are necessary to gain access to the
18 digital device or data stored on the digital device; and

19      g.   Any passwords, password files, biometric keys, test
20 keys, encryption codes, or other information necessary to access the
21 digital device or data stored on the digital device.

22      8.   During the execution of this search warrant, law
23 enforcement is permitted to: (1) depress the thumbs and/or fingers of
24 MARK PAUL, MICHAEL POLIAK, GEORGE VASQUEZ, and HILLARY and STEVE
25 BARTH onto the fingerprint sensor of the device (only when the device
26 has such a sensor), and direct which specific finger(s) and/or
27 thumb(s) shall be depressed; and (2) hold the device in front of the
28 face of those persons with their eyes open to activate the facial-,

<div align="center">9</div>

<div align="center">**EXHIBIT A**</div>
<div align="center">**18**</div>

1  iris-, or retina-recognition feature, in order to gain access to the

2  contents of any such device.  In depressing a person's thumb or

3  finger onto a device and in holding a device in front of a person's

4  face, law enforcement may not use excessive force, as defined in

5  Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement

6  may use no more than objectively reasonable force in light of the

7  facts and circumstances confronting them.

8      9.   The special procedures relating to digital devices found in

9  this warrant govern only the search of digital devices pursuant to

10 the authority conferred by this warrant, and do not apply to any

11 other search of digital devices.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

10

**EXHIBIT A**
**19**

A F F I D A V I T

I, Lynne K. Zellhart, being duly sworn and under oath, hereby depose and say as follows:

**AFFIANT'S BACKGROUND**

1.    I am a Special Agent ("SA") with the FBI, and have been so employed since May 2004. I am currently assigned to a White Collar Crime squad, which investigates money-laundering facilitation. Prior to this assignment, I was assigned to the Southwest Border Anti-Money Laundering Task Force ("SWBAMLTF") in Los Angeles, which investigated large-scale, money-laundering activities associated with Mexican Criminal Enterprises ("MCE"), and was comprised of Special Agents from the FBI and deputies from the Los Angeles County Sheriff's Office. Prior to my assignment with the SWBAMLTF, I was assigned to a Los Angeles High Intensity Drug Trafficking Area ("HIDTA") group, which investigated drug trafficking organizations. I have also been assigned to a criminal enterprise (Bloods and Crips) task force in Los Angeles, as well as the Northern Ohio Law Enforcement Task Force, which is also engaged in investigations of drug trafficking organizations. In addition to Special Agent training at Quantico, Virginia, I have attended DEA-sponsored Basic Narcotics Investigator School, a 40-hour intensive training for federal narcotics investigators. I have also attended a 40-hour Asset Forfeiture/Money Laundering class, two week-long money laundering facilitation conferences and several other conferences sponsored by the various anti-money laundering interests. I have made presentations on money laundering investigations at several training conferences including the *Asset Forfeiture Summit for Law Enforcement Executives* (March

1

1  2018), the *Advanced Money Laundering Conference* (May 2018), and *Money*
2  *Laundering Across Investigative Programs* (October 2018).

3      2.    I have participated in numerous investigations of criminal
4  enterprises, including violent criminal street gangs, drug-
5  trafficking organizations, and businesses that are facilitating the
6  laundering of criminal proceeds.  During the course of these
7  investigations, I have identified co-conspirators through the use of
8  telephone records and bills, financial records, photographs, and
9  other documents.  I have directed and assisted in the handling of
10  confidential sources to successfully infiltrate various-sized
11  criminal enterprises via intelligence gathering, participation in
12  consensual recordings, and the monitored purchase of a controlled
13  substance.  I have participated in debriefings of cooperating
14  defendants.  I have executed search warrants for controlled
15  substances, documents, digital records and the proceeds of drug
16  trafficking and other crimes.  I have conducted physical and
17  electronic surveillance.  I have also conducted investigations in
18  which I have used Global Positioning System ("GPS") information to
19  locate and track persons who are the subjects of criminal
20  investigations.  I have directed and participated in investigations
21  involving the use of court-authorized interception of wire
22  communications.  I have engaged in extensive document-based
23  investigations, collecting, reviewing and analyzing bank documents,
24  wire transfers, employment records, e-mail, and database research.

25  **I.    PURPOSE OF AFFIDAVIT: SEARCH AND SEIZURE WARRANTS**

26      3.    This affidavit is made in support of search warrants for
27  the business U.S PRIVATE VAULTS ("USPV"), and the homes of USPV's
28  principals MARK PAUL, MICHAEL POLIAK, GEORGE VASQUEZ (also known as

<div align="center">2</div>

<div align="center">

**EXHIBIT A**
**21**

</div>

1  JORGE VASQUEZ), STEVE BARTH and HILLARY BARTH, for evidence of

2  violations of 18 U.S.C. §§ 371, 1343, 1956; 21 U.S.C. §§ 841, 846;

3  and 31 U.S.C. §§ 5324 and 5331 (hereafter, the SUBJECT OFFENSES), as

4  described more fully in Attachment B, which is incorporated by

5  reference.  The locations to be searched (collectively, the "SUBJECT

6  PREMISES"), described more fully in Attachments A which are also

7  incorporated by reference, are:

8          a.   U.S. PRIVATE VAULTS, 9182 W. OLYMPIC BLVD., BEVERLY

9  HILLS, CALIFORNIA ("USPV").

10         b.   



18     4.   This affidavit is also made in support of a seizure warrant

19 for the business computers, money counters, nests of safety deposit

20 boxes and keys, digital and video surveillance and security equipment

21 and biometric scanners located at USPV, 9182 West Olympic Blvd.,

22 Beverly Hills, CA 90212, which are subject to seizure pursuant to 18

23 U.S.C. § 982(b)(1), 21 U.S.C. § 853(f) and 31 U.S.C. § 5317(c) and

24 forfeiture pursuant to 18 U.S.C. § 1956 (money laundering), 21 U.S.C.

25 § 841 (drug trafficking) and 31 U.S.C. § 5324 (structuring) because

26 there is probable cause to believe that those items were used or

27 intended to be used to facilitate violations of 18 U.S.C. §§ 1956, 21

28 U.S.C. § 841 and 31 U.S.C. § 5324, and conspiracy to commit the same.

3

**EXHIBIT A**
**22**

1     5.    The information set forth in this affidavit is based upon
2 my participation in the investigation, encompassing my personal
3 knowledge, observations and experience, as well as information
4 obtained through my review of evidence, investigative reports, and
5 information provided by others, including other law enforcement
6 partners.  As this affidavit is being submitted for the limited
7 purpose of securing the requested warrants, I have not included each
8 and every fact known to me concerning this investigation.  I have set
9 forth only the facts that I believe are necessary to establish
10 probable cause for the requested warrants.

11 **II.  Summary of investigation**

12     6.    U.S. Private Vaults is a business in a strip mall that
13 rents safety deposit boxes anonymously.  It is owned and managed by
14 criminals who engage in money laundering, drug trafficking, and
15 structuring, among other offenses.  Its business model is designed to
16 appeal to criminals for customers.  It charges many times what banks
17 do for similar safety deposit box rentals, but staff conduct
18 countersurveillance for customers, alert them to law enforcement
19 investigations, and structure transactions for them to avoid filing
20 currency reports--in addition to providing them a place to store
21 criminal proceeds anonymously.  USPV also launders for its customers
22 cash that is purported to be drug proceeds by converting it into
23 precious metals or wire transfers.  The great majority of USPV
24 customers pay cash to rent their safety deposit boxes, at least some
25 of which USPV then deposits into their own bank account, which it
26 uses to pay its operating expenses.  By using its customers' criminal
27 proceeds to maintain its own anonymous facility for the storage of
28 criminal proceeds, USPV engages in money laundering.

<div align="center">4</div>

<div align="center">

**EXHIBIT A**

**23**

</div>

III.  **PROBABLE CAUSE**

    **A.  US PRIVATE VAULTS HAS BEEN INDICTED**

    7.  The Grand Jury indicted corporate defendant U.S. PRIVATE VAULTS INC. for Conspiracy to Launder Money, Conspiracy to Distribute Controlled Substances, and Conspiracy to Structure Transactions on March 9, 2021.  The indictment also contained forfeiture allegations against certain business equipment located at USPV, which the Grand Jury explicitly found were supported by probable cause.  The indictment is attached and incorporated by reference.  AUSA Andrew Brown informed me that:

    a.  The Ninth Circuit held in *United States v. Seybold*, 726 F.2d 502, 504-05 (1983), that magistrates may consider the information contained in an indictment in making a subsequent probable cause determination, such as for search and seizure warrants.

    b.  The legislative history of forfeiture statute 21 U.S.C. § 853 indicates that Congress intended a grand jury's finding in support of forfeiture to be given considerable weight:

> For the purposes of issuing a restraining order, the probable cause established in the indictment . . . is to be determinative of any issue regarding the merits of the government's case on which the forfeiture is to be based.

S. Rep. No. 225, 98th Cong., 2d Sess. 203 (1984), reprinted in 1984 U.S. Code Cong. & Administrative News 3182, 3386.

    Here, the description of the USPV business equipment that I seek to seize by seizure warrant is identical to the description of the USPV business equipment that the Grand Jury found probable cause to forfeit in their indictment.

**EXHIBIT A**
**24**

**B.  INVESTIGATION BACKGROUND**

8.    In approximately 2015, several state and federal law enforcement agencies including the Federal Bureau of Investigation ("FBI"), the Drug Enforcement Administration ("DEA"), the United States Postal Inspections Service ("USPIS"), the Los Angeles Police Department ("LAPD"), and the Los Angeles County Sheriff's Department ("LASD") learned that the targets of criminal investigations were employing the services of U.S. PRIVATE VAULTS ("USPV") to store criminal proceeds.  Separate and unrelated investigations into drug trafficking, human trafficking, illegal gambling, racketeering, computer intrusion, insurance fraud and identity theft led investigators to the doorstep of USPV.  Search warrants executed on individual boxes within USPV consistently produced criminal proceeds and evidence of criminal conduct.

9.    The following individuals have an ownership or management interest in USPV as described:

a.    Mark PAUL - PAUL is the owner and founder of USPV. According to California Secretary of State records, PAUL is the CEO and registered agent of USPV.  PAUL has held himself out to be the owner of USPV publicly and privately.  PAUL told CS-1, discussed later in this affidavit, that he has the ability to monitor activities inside USPV remotely from his residence at ██████████ ██████████████████████████████.

b.    Michael POLIAK - In 2019 POLIAK became a co-owner of USPV.  POLIAK purchased a 50% interest in the business - 25% from Hilary BARTH (HILLARY BARTH) and Steve BARTH (STEVE BARTH) and 25% from Mark PAUL.  POLIAK himself stated that he paid $475,000 for his share of the business - "two-seventy-five clean; two hundred dirty."

6

**EXHIBIT A**
**25**

1   Bank records show that in April 2019, Michael POLIAK transferred
2   $225,000 to USPV's business bank account. Agents believe the
3   remainder was paid in cash (i.e. "dirty") to PAUL and the BARTHs.
4   POLIAK was a USPV customer for two years before becoming an owner.

5         c.   George VASQUEZ - VASQUEZ is employed at USPV as
6   manager and armed guard. He works Tuesday through Saturday during
7   business hours and handles new customers, sales, security, and all
8   matters of operation. Secretary of State records (2019) list VASQUEZ
9   as "manager" of USPV. The Beverly Hills Chamber of Commerce website
10  lists VASQUEZ as USPV's Vice President.

11        d.   Matt BONVICIN - BONVICIN is a partner at USPV and its
12  Chief Technology Officer. Bank records show that BONVICIN's company,
13  SPORTSWARE INC., receives regular payments from USPV, including two
14  large payments after POLIAK bought in to the company in April 2019.

15        e.   HILLARY BARTH and STEVE BARTH owned a 25% interest in
16  USPV prior to POLIAK buying them out. They operate OLYMPIC GOLD &
17  JEWELRY on a daily basis, and operate USPV on VASQUEZ's day off.
18  OLYMPIC GOLD & JEWELRY is located at the same physical location as
19  USPV and engages in buying and selling gold and silver, often to USPV
20  customers. STEVE BARTH is listed on a 2016 Secretary of State filing
21  as "Secretary" of USPV. HILLARY BARTH is listed as a
22  "representative" of USPV on the Beverly Hills Chamber of Commerce
23  website.

24      **C.**   **HOW USPV OSTENSIBLY OPERATES**

25     10.  According to its own advertising literature, website and
26  statements made to investigators, USPV operates as follows:

27
28

<div align="center">7</div>

1          a.    Customers may rent a safe deposit box ranging in size
2    in inches between 3 x 5 x 22 (smallest) and 10 x 10 x 22 (largest)
3    for $575 to $1,800 a year, respectively.

4          b.    An iris scan provides the customer with access to the
5    vault.  No personal information, social security number, driver's
6    license or other forms of identification are required to rent or
7    access a box.

8          c.    The customer keeps all keys.  The keys do not contain
9    or denote box numbers on them.

10         d.    A hand scan is taken as a second form of biometric
11   identification, in the event iris data is lost or a customer loses an
12   eye.

13         e.    A second person may have access to a box, if the
14   customer so chooses, and the second individual is present with the
15   customer when access is arranged; the second party's access is also
16   through iris scan; and the customer may revoke the second party's
17   access at any time.

18         f.    USPV has 24/7 electronic monitoring, 24/7 armed
19   response, and the vault is time locked when not open.

20         g.    In the event of non-payment for three months, USPV
21   will drill open the box.  USPV recommends that customers leave
22   contact information inside the box to account for this situation.
23   However, "If no contact information is found, we will store the
24   contents of your box in our private safe for three years. Thereafter,
25   we are required to escheat (forward) the contents to the State of
26   California."  (USPV Website, Frequently Asked Questions).

27

28

8

**EXHIBIT A**
**27**

**D.    US Private Vaults (USPV) Is Designed to Appeal to and Cater to Criminals**

11.    USPV's primary pitch to customers is anonymity: "Complete Privacy; Biometric Identification; No ID Required.[1]"    By providing and promoting total anonymity, USPV caters to and attracts criminals, who seek to keep their identities and the source of their cash beyond the reach of banks, regulators, the IRS, and law enforcement.

12.    On USPV's website[2], Chief Technology Officer Matt BONVICIN[3] boasts, "Our business is one of very few where we don't even want to know your name.  For your privacy and the security of your assets in our vault, **the less we know the better**."    The statement by USPV "the less we know, the better" suggests they know that their customers are using the vault for criminal purposes, such as storing illegal proceeds.  This practice appeals to those engaged in activities which they wish to hide from legal authorities and law-abiding financial institutions.

13.    USPV puts forth a similar rationale with regard to use of USPV safe deposit boxes versus bank safe deposit boxes.  On its website, another USPV executive[4] posted "Four Reasons to Store Your Gold At USPV," asserting: "Banks require clients to provide their

---

[1] USPV website, www.usprivatevaults.com

[2] usprivatevaults.com/uspv-news

[3] This post on the USPV web page was written by Matt Bonvicin who is described at the end of the post as follows: "Matt is an entrepreneur, programmer, and database/systems admin who enjoys toying with technologies.  He is a partner at U.S. Private Vaults as well as its Chief Technology Officer."

[4] This post on the USPV website (usprivatevaults.com) was written by Kent Martin, who is described at the end of the post as follows: "A serial entrepreneur with a background in investment banking, Kent is a founding partner of U.S. Private Vaults and serves as its Chief Executive Officer."  We believe Martin is no longer USPV's Chief Executive Officer; however, the post remains on their website.

9

**EXHIBIT A**
**28**

1  social security number and a photo identification as a condition for
2  renting a safe deposit box. Your information is then filed in the
3  bank's central data system. This information can be easily accessed
4  by government agencies (such as the IRS) or attorneys armed with
5  court orders. If no one is aware you have a safe deposit box, the
6  contents (your gold) are much safer."  By advocating a service which
7  circumvents the IRS and persons "armed with court orders," USPV
8  tacitly acknowledges that criminal proceeds (which the government has
9  a legitimate interest in) can be secreted at USPV, but not at banks
10 or law abiding financial institutions.

11     14.   In the same post ("Four Reasons to Store Your Gold At
12 USPV"), the same USPV executive wrote:  "As government chartered
13 institutions, banks are now required to file 'suspicious activity
14 reports.' . . . . U.S. Private Vaults is not subject to federal
15 banking laws and would only cooperate with the government under court
16 order."  In this way, USPV is marketing its service to criminals and
17 those operating outside the law.

18     15.   THE USPV website also contains a link to an article titled,
19 "The Los Altos Vault and Safe Deposit Co. up for sale."  The article
20 attributes the following comment to USPV owner MARK PAUL: "Another
21 growing segment of private safety deposit renters is legal cannabis
22 distributors. Although their business may be sanctioned in the state
23 of California, it's not legal on the federal level, so they can't
24 conduct business through banks."  In this statement, PAUL invites
25 those engaged in violations of federal law to utilize private vaults,
26 (such as USPV).  Additionally, as discussed in more detail later,
27 cannabis distributors operating legally under California law may
28 theoretically exist and use private vaults, but the reality is that

<div align="center">10</div>

1    many engaged in secreting cannabis sale proceeds at USPV are acting

2    outside California law as well as federal law.   Indeed, all of the

3    identified marijuana traffickers and their associates linked to USPV

4    in this investigation are operating outside the law of California, as

5    described in more detail later.

6        **E.    Other Safety Deposit Box Companies Do Not Permit Anonymous**
         **Users as USPV Does**

7

8        16.   Private safe deposit boxes are not in and of themselves

9    illegal or suspicious.   In fact, investigators have identified

10   businesses which offer this service in a manner which does not cater

11   to or attract criminals.   For example, Ultra Vault[5] provides similar

12   services, but requires customers to fill out registration forms, and

13   provide sufficient information for Ultra Vault to conduct due

14   diligence or "Know Your Customer ("KYC")."   Conducting due diligence

15   or "KYC" would likely deter criminals, rather than attract them, as

16   this type of inquiry might expose the illegal source of funds;

17   customer's lack of employment or legitimate income; criminal history;

18   residence or citizenship; or other factors which a criminal customer

19   would not want known.   Additionally, Ultra Vault has some physical

20   locations, but also offers removable box pick-up and delivery.   While

21   this would be convenient to a law-abiding, legitimate customer, it

22   would not appeal to someone engaged in criminal activity, as it would

23   expose additional details about him/her such as address details, home

24   environment, family, etc.   Thus the policies and procedures of a

25   company such as Ultra Vault would likely repel, rather than attract,

26   criminal actors.

27

28

_____

[5] https://www.ultra-vault.com/how-it-works/

11

**EXHIBIT A**
**30**

1    17.  Similarly, BlueVault, which has locations in San Diego and
2  Orange County, provides similar services, including co-located gold
3  and silver exchange.  However, in contrast to USPV, BlueVault
4  requires "An acceptable photo ID showing a US address[6]" in order to
5  rent a safe deposit box or vault.  Elsewhere on the website, it again
6  notes "A valid US Driver's License (or equivalent) is required."
7  Requiring both a photo ID and a valid address will deter criminals
8  who do not want to be identified, who live outside the US and may be
9  moving criminal proceeds across the border, or who do not want law
10  enforcement to be able to identify or find them as part of a criminal
11  investigation.  Thus, in contrast to USPV, BlueVault has policies in
12  place which would deter rather than attract criminal clientele.
13    18.  Similarly, traditional banks and financial institutions
14  which provide safe deposit boxes, do so in a manner which does not
15  cater to and attract criminals.  For example, many explicitly
16  prohibit the storage of cash:  Wells Fargo prohibits "cash, coin and
17  currency;" JP Morgan Chase requires a renter to "agree not to use the
18  box to store money, coin or currency unless it is of a collectable
19  nature;" and HSBC requires renters to agree "that you will not place
20  into the Box: cash, currency or legal tender of any country or
21  jurisdiction.[7]" Furthermore, safe deposit box rental agreements at
22  most major financial institutions explicitly advise that the bank
23  will comply with all subpoenas, search warrants and legal process,
24  and that the bank reserves the right to enter into the box if it has
25  reason to believe that the box contains any prohibited or dangerous
26
27  _____
    [6] https://www.bluevaultsecure.com/
28
    [7] Statements taken from Safe Deposit Box rental agreements.
                              12

**EXHIBIT A**
**31**

1  item. Rental agreements also frequently include language referring
2  the "Know Your Customer" rules of identification, investigation and
3  due diligence, all of which would deter criminals from using their
4  safe deposit boxes in the manner employed by USPV customers.

5      19. State banking regulations in New York and New Jersey also
6  prohibit *anonymous* safe deposit boxes. Both Mark PAUL and Michael
7  POLIAK have acknowledged as much, during discussions about expanding
8  USPV to other states. During such a discussion, which included PAUL,
9  POLIAK, VASQUEZ and a Confidential Source ("CS-1")[8], PAUL stated
10 explicitly that they could not open a branch in New York because of
11 the banking laws. Similarly, POLIAK, who is from the New York/New
12 Jersey area told CS-1 that he hired attorneys to figure out a way to
13 open a business similar to USPV in New York or New Jersey and
14 concluded it was impossible, as the laws do not permit anonymity.
15 POLIAK emphasized that anonymity is the key to the business model.
16 POLIAK therefore decided NOT to expand to New York/New Jersey because
17 he determined that the laws preventing anonymity would have rendered
18 his business model for a private vault unprofitable.

19
20
21
---
22     [8] During the course of this investigation, agents obtained
   information and operational assistance from an undisclosed
23 Confidential Source (CS-1). CS-1 has provided information to the
   USPIS since 2008. CS-1 has provided information and expertise
24 regarding criminal investments, monetary practices, accounting and
   money laundering. CS-1's information has led to the seizure of
25 assets, including $200,000 in a mortgage fraud case. CS-1's
   information has been corroborated by independent sources such as law
26 enforcement database checks, review of other records, recordings,
   surveillance, interviews and other investigative activity. CS-1's
27 information has never been found to be false or misleading. CS-1
   has no criminal history. I believe CS-1's information is highly
28 credible.

<center>13</center>

<center>**EXHIBIT A**
**32**</center>

**F.   USPV and its Principals Profit from Patrons' Willingness to Pay a Premium for Anonymity**

22.   A survey of safe deposit box pricing demonstrates that patrons of USPV could rent a safe deposit box at a major financial institution for a fraction of the cost.  For example, a 10 x 10 box at JP Morgan Chase rents for $350; at PNC for $146; at TD Bank for $150-$360 depending on location; and at Bank of America for $300-360 depending on location[9].  In November 2020, a representative from a Wells Fargo branch in Los Angeles advised that a 14 x 9 safe deposit box (most comparable size) rents for $200 a year.  By contrast, USPV charges between $1800 (if paid annually) and $2000 (if paid quarterly) for the same/similar 10 x 10 box.  USPV charges six to ten times what major banks charge, banks which offer security, a national presence, experience, years in business, and are often American institutions.  By contrast, USPV has been in business for ten years, is located in a strip-mall, and its owners are generally unknown to customers.  As discussed throughout this affidavit, USPV charges a premium for its services because it offers something which legitimate banks do not: anonymity, a place to store illegally obtained cash, counter-surveillance, tips and assistance for avoiding law enforcement, money laundering through the co-located gold and silver trade, and a stated willingness to look the other way with regard to all kinds of criminal conduct.

---

[9] "BANKING 101: WHAT DOES A SAFE DEPOSIT BOX COST? AVERAGE RATE BY SIZE" by Dillon Thompson.   March 1, 2020.  www.depsositaccounts.com

14

**EXHIBIT A**
**33**

**G.  USPV Has, In Fact, Been Used By Criminals to Store Criminal Proceeds**

20.  As set forth above, USPV is designed to appeal to and cater to criminals, and has been successful in doing so.  Numerous federal, state and local investigations have led law enforcement to USPV repeatedly.  The contents of specific USPV boxes have been forfeited to the government because they are the proceeds of criminal activity. The cases below exemplify this.  According to court documents and law enforcement reports:

a.  OWEN HANSON -- On September 9, 2015 federal agents executed a federal search warrant for three separate safe deposit boxes located at USPV. The boxes belonged to OWEN HANSON who was the leader and organizer of ODOG ENTERPRISE, an association existing for the purpose of importing and exporting controlled substances; conducting an illegal gambling business; bookmaking; promoting racketeering activities; and money laundering.  As part of the enterprise, HANSON's organization distributed methamphetamine, heroin, cocaine and ecstasy.  HANSON was indicted and pleaded guilty to Racketeering Conspiracy and Conspiracy to Distribute Illegal Narcotics.  As a result of the search warrants at USPV, agents seized a $5,000 bond; approximately 400 one-ounce silver coins; and twenty-six ten-ounce silver bars.  The contents of HANSON's USPV boxes were forfeited as criminal proceeds[10].

b.  CYRUS IRANI -- On October 28, 2015, federal agents executed a federal search warrant on Box 2105 at USPV.  The box belonged to CYRUS IRANI who was the master bookmaker and head of an

[10] UNITED STATES OF AMERICA v. OWEN HANSON, Case No. 15cr2310-WQH, U.S. District Court, Southern District of California

15

**EXHIBIT A**
**34**

illegal gambling organization.  IRANI's organization operated both
internet and traditional bookmaking operations, and engaged in money
laundering.  IRANI had well over 1500 gambling accounts under his
ultimate supervision.  IRANI pleaded guilty to Enterprise Corruption;
fourteen others in the IRANI organization were also convicted of
various gambling, money laundering and enterprise corruption charges.
As a result of the search warrant at USPV, agents seized $500,000 in
U.S. currency; a box containing 15 gold coins and 22 gold bars; and
documents.  The contents of IRANI's USPV box were forfeited as
criminal proceeds.

     c.   NATHAN HOLTZ -- On November 3, 2015 a state search
warrant was executed at USPV on a box rented by NATHAN HOLTZ.  HOLTZ
had been arrested earlier that day for a violation of California
Health & Safety code §11370.9 (possession of narcotics proceeds),
after leaving USPV. HOLTZ had $55,200 in his vehicle, as well as keys
to his USPV box.  A search of HOLTZ's USPV box resulted in the
seizure of an additional $200,100.  HOLTZ was on active probation for
a prior marijuana sales conviction and admitted that the cash was
proceeds of interstate transportation and sale of marijuana[11].  The
cash was forfeited as criminal proceeds.

     d.   GERALD LEBOWITZ -- On November 12, 2015 GERALD
LEBOWITZ consented to a search of his box at USPV, stating at the
time that cash in the vault was brought into the country illegally to
avoid taxes.  Agents from the DEA seized $1,543,400 from LEBOWITZ's
box, which he disclaimed.  Further investigation into LEBOWITZ
revealed that he was part of a conspiracy to manufacture and

---

[11] Note that these events pre-date the legalization of marijuana
in California, and involve illegal interstate sales in any case.

16

**EXHIBIT A**
**35**

1 distribute methaqualone, a controlled substance. During the course
2 of the investigation, agents seized over 45 kilograms of methaqualone
3 powder and 12 canisters of the chemical o-Taluidine, both chemical
4 precursors. In addition, agents seized over $4 million, beyond that
5 disclaimed at USPV. In 2017 LEBOWITZ pleaded guilty to possession
6 with intent to distribute methaqualone and money laundering. All
7 assets were forfeited as criminal proceeds[12].

8        e.    Prostitution Ring -- In 2014, FBI Newark initiated an
9 investigation into a network of individuals engaged in facilitation
10 of prostitution, including child prostitution; Mann Act violations;
11 money laundering and possession of child pornography. FBI Newark
12 identified the leader of the organization (Newark Target Subject,
13 hereafter "Newark TS") who operated a high-end escort service and
14 provided prostitutes to clients nationally. Based on information
15 from multiple confidential sources, investigators learned that Newark
16 TS has had as many as five different boxes at USPV. Additionally,
17 investigators learned that Newark TS accessed his USPV boxes
18 approximately 50 times between July 2012 and December 2016. On one
19 occasion, an FBI Confidential Source[13] ("CS-2") went to USPV with

20 _____

21        [12] UNITED STATES OF AMERICA v. GERALD LEBOWITZ, Case No. 2:17-cr-
00053-CAS, U.S. District Court, Central District of California

22        [13] CS-2 provided information to FBI Newark. The information CS-2
provided to the FBI about Newark TS's prostitution business has proved to
23 be accurate and reliable based on corroboration from several independent
sources. For instance, CS-2's description of Newark TS's efforts to
24 recruit CS-2 for prostitution from the adult film industry has been
corroborated by open sources of information, including social media
25 websites, identifying CS-2 as a performer in the adult film industry.
Moreover, CS-2 contacted law enforcement of his/her own volition and
26 provided information concerning Newark TS's criminal activities and his/her
criminal activities without any promise of immunity from prosecution,
27 remuneration, or other benefits. Federal agents have been able to
corroborate the vast majority of information provided by CS-2 through
28 public records, U.S. passport and foreign travel records, and business

17

**EXHIBIT A**
**36**

1  Newark TS and personally saw what he/she estimated to be $250,000 US
2  currency in Newark TS's USPV box. On a separate occasion, CS-2 went
3  to USPV with Newark TS and saw what he/she estimated to be $500,000
4  in US currency.  Further, CS-2 observed computer discs, digital
5  devices and back-up computer hard drives in Newark TS's USPV box.
6  CS-2 was aware that Newark TS used these digital devices to store
7  photos, videos and other data associated with prostitution,
8  pornography, and child pornography.  CS-2 was also aware that Newark
9  TS stored client lists, pornographic photos and pornographic videos
10 of clients, for possible use as leverage and/or blackmail.  Based on
11 business records obtained in January 2020, Newark TS continues to
12 rent a box at USPV.  FBI Newark's investigation into this subject is
13 on-going.

14         f.    MIKHAIL MALYKHIN -- On September 1, 2016 federal
15 agents executed a federal search warrant on box 5005 at USPV.  The
16 box belonged to MIKHAIL MALYKHIN who was the leader of an identity
17 theft/computer intrusion fraud ring.  MIKHAIL and others were
18 involved in a complex scheme which involved altering hacked "Flexible
19 Spending Account" debit cards from a health insurance provider and
20 altering the codes to cash out the debit cards.  MIKHAIL was also
21 involved in credit card fraud, ATM fraud, tax fraud, computer
22 intrusion and other similar crimes.  MIKHAIL was indicted for
23 conspiracy to commit access device fraud and pleaded guilty.  As a
24 result of the September 1, 2016 search warrant at USPV, agents seized
25 $266,150 United States Currency; four one-ounce gold bars; various
26
27 incorporation records, Internet searches of social media pages and
   websites, and information provided by other witnesses.  Accordingly, Your
28 Affiant submits that CS-2's information is credible and reliable under the
   totality of the circumstances.

18

**EXHIBIT A**
**37**

1  gift cards which had been loaded with over $20,000 in value; two
2  Russian passports; a car Certificate of Title for a 1966 Ford
3  Mustang; two digital devices (flash drives) containing evidence of
4  the offenses; and four more gold keys, identical to those used at
5  USPV.  Additional warrants were obtained for the additional USPV
6  boxes.  Those warrants resulted in the seizure of $592,450 US
7  Currency from one box and $435,190 from another.  The contents of all
8  of MIKHAIL's USPV boxes were forfeited as criminal proceeds and used
9  to pay restitution to victims[14].

10       g.    VINCENT RAMOS -- On March 6, 2018 federal agents
11  executed a federal Seizure Warrant for the contents of Box 314 at
12  USPV.  The box belonged to VINCENT RAMOS who was the CEO of Phantom
13  Secure, a criminal enterprise which facilitated the importation,
14  exportation and distribution, internationally, of wholesale
15  quantities of cocaine, heroin and methamphetamine.  Phantom Secure
16  provided encrypted communications devices to drug trafficking
17  organizations to further international drug trafficking, while
18  obstructing and impeding law enforcement.  RAMOS was indicted for and
19  pleaded guilty to Racketeering and Drug Trafficking.  As a result of
20  the search warrants at USPV, agents seized $101,080 in US Currency
21  and 26 one-ounce gold coins.  The contents of RAMOS's USPV box were
22  forfeited as criminal proceeds[15].

23       h.    ALLAN NEYMAN et al. -- On April 24, 2019, Victim S.S.
24  was kidnapped in San Diego, California and taken against his will to
25  a warehouse in Los Angeles.  While being held in the warehouse, S.S.
26
27  ────────────────────────
   [14] UNITED STATES v. MIKHAIL KONSTANTIVOV MALYKHIN, No. 16-0688-
   DMG, United States District Court, Central District of California
28  [15] UNITED STATES v. VINCENT RAMOS, Case No. 18CR1404-WQH, United
   States District Court, Southern District of California
                                  19

**EXHIBIT A**
**38**

1  was brutally tortured.  He was hit with sticks and baseball bats;
2  stripped naked; tasered on his penis and testicles; hit with a hammer
3  on his toes; doused in a flammable liquid; set on fire; and anally
4  penetrated with a foreign object.  S.S. had been employed by a group
5  of people who were engaged in the distribution of counterfeit
6  marijuana vaping cartridges.  This group believed that S.S. stole a
7  suitcase full of cash, which a vape cartridge customer left at the
8  warehouse.  S.S. had a portion of the money with him in San Diego;
9  the rest was left with his ex-wife, who placed the cash in a safe
10 deposit box at USPV.  At the direction of the kidnappers, she
11 retrieved the cash from USPV and delivered it as ransom.  S.S.
12 eventually escaped from the warehouse.  Detectives identified ALLAN
13 NEYMAN and four others who participated in the kidnapping and
14 torture.  They were arrested and charged with violations of
15 California Penal Code 209(a) - Kidnap for Ransom; P.C 664/187(a) -
16 Attempt Murder; P.C. 206 - Torture; and P.C. 205 - Aggravated Mayhem.
17 Investigators believe that the money stored at USPV was the proceeds
18 of criminal activity; stolen; the cause of brutal violence; and used
19 as ransom.  During the course of this investigation, agents also
20 learned that NEYMAN is an associate of USPV owner Michael POLIAK.  In
21 conversations with CS-1, POLIAK described in detail, the April 2019
22 kidnapping/torture and attributed the crime to his business
23 associate, NEYMAN.  POLIAK told CS-1 that he purchased vape
24 cartridges and packaging (but not THC oil) from NEYMAN ("my guy who
25 owned the warehouse") for his marijuana vape business.  Furthermore,
26 POLIAK said to CS-1, "you want to hear the funny thing?  The money
27 was in my vault! His wife put money into my vault," explicitly
28 acknowledging USPV's role in the crime.  Additionally, on or about

20

**EXHIBIT A**
**39**

1  January 27, 2020, CS-1 met NEYMAN with POLIAK and discussed various
2  internet-based fraud schemes which might generate income.  POLIAK and
3  CS-1 had previously discussed taking over NEYMAN's business interests
4  due to NEYMAN's pending incarceration.

5       i.   MATTHEW BEAVER -- On July 1, 2019, agents of the DEA
6  and LAPD seized $215,653 in US currency from MATTHEW BEAVER, who was
7  observed entering and leaving USPV.  BEAVER was arrested for
8  violations of California Health & Safety Code Section §11370.6,
9  transportation of narcotics proceeds greater than $100,000.  Pursuant
10 to his arrest, agents seized the cash, as well as eight cell phones
11 and keys which were similar to the keys which open boxes at USPV.  On
12 July 8, 2019 a state search warrant was served on USPV boxes #6515
13 and #7111.  Agents seized $1,448,700 from those boxes.  Subsequent
14 search warrants executed on BEAVER's phones revealed evidence of his
15 involvement in marijuana trafficking.  BEAVER has a criminal history
16 and is not licensed to distribute or grow marijuana in California or
17 any other state.  Per the California Employment Development
18 Department (EDD), BEAVER has no employment which would generate the
19 income represented by this cash seizure.  BEAVER admitted his
20 participation in an illegal marijuana business.   BEAVER admitted
21 that the cash was the proceeds of unlawful criminal activity.  The
22 cash was therefore forfeited.

23      j.   Between February 1, 2020 and February 26, 2021, agents
24 conducted surveillance at USPV.  Agents identified many current USPV
25 customers who, based on my training and experience, are likely
26 engaged in criminal activity and storing criminal proceeds or
27 evidence of crimes at USPV.  For example, on February 12, 2020,
28 agents observed a couple enter USPV who were subsequently identified

<div align="center">21</div>

<div align="center">**EXHIBIT A**
**40**</div>

1   and linked to an FBI San Diego healthcare fraud investigation.
2   Similarly, agents observed subject H.T. at USPV on three separate
3   occasions; H.T. is the subject of a current healthcare fraud
4   investigation by FBI Los Angeles.  A third healthcare fraud suspect
5   appeared at USPV on May 28, 2020.  On June 9, 2020, agents identified
6   a USPV customer who was subsequently linked to a current, on-going
7   investigation into dark-web drug trafficking.  Agents also identified
8   a USPV customer who is closely associated with a group being
9   investigated for the theft of thousands of cell phones. Another
10  individual identified has been associated to an FBI Los Angeles
11  (Russian) counterintelligence investigation.  Another customer
12  identified in February 2021 was referred to FBI Los Angeles for a
13  possible Ponzi scheme.  Furthermore, on multiple occasions agents
14  observed USPV patrons in vehicles with out of state license plates,
15  specifically Illinois, Ohio and Nevada.  Based on my training and
16  experience in money laundering investigations, Chicago, Illinois is a
17  hub of both drug trafficking and money laundering.  I believe these
18  patrons were using their USPV box to store drug proceeds.  Agents
19  also observed a number of USPV patrons in rental cars.  Based on my
20  training and experience, drug traffickers often rent vehicles to
21  transport drugs and cash, in an effort to remain anonymous, and hide
22  their identities from law enforcement.
23
24
25
26
27
28

22

**EXHIBIT A**
**41**

**H.** **USPV Principals Are Aware That Their Customers Are Engaged in Criminal Conduct and Store Criminal Proceeds at USPV**

    1.   MARK PAUL described his customers as bookies, prostitutes, and weed guys

21.   During the course of this investigation, agents spoke with a Cooperating Witness ("CW-1")[16]. According to CW-1, prior to his/her arrest and incarceration, CW-1 rented multiple safe deposit boxes at USPV. CW-1 became acquainted with USPV owner, MARK PAUL, and they became friends. Based on conversations CW-1 had with PAUL, PAUL was aware that USPV customers, including CW-1, were engaged in criminal activity. PAUL told CW-1 that his best USPV customers were "bookies," "prostitutes," and "weed guys." PAUL designed the business to appeal to people operating outside the law or "in the gray area." PAUL specifically told CW-1 that the business was designed to help people hide money from the IRS and the FBI. Based on their conversations, CW-1 described PAUL as an advocate of not paying taxes on one's cash.

22.   CW-1 routinely discussed his/her illegal gambling business with PAUL, and PAUL was aware that CW-1 earned money from running an

---

[16] CW-1 has provided information to the FBI since 2015. CW-1 hopes to reduce his/her current sentence by providing information to the FBI. Specifically, CW-1 has provided information leading to the indictment of 5 individuals involved in drug trafficking and money laundering. The credibility of CW-1's testimony, however, is limited because CW-1 has omitted (and outright lied about) key facts when those facts implicated relatives or close friends who were continuing to run his/her criminal organization after his/her arrest. Although the United States does not possess any evidence to suggest CW-1 lied about the information discussed herein, CW-1's credibility is effectively limited to only testimony that can be corroborated by other independent evidence. To that end, much of CW-1's information has been corroborated by independent sources such as law enforcement database checks, interviews and evidence gathered in other related FBI investigations, review of business records, surveillance, and other investigative activity.

23

**EXHIBIT A**
**42**

1  illegal gambling business.  PAUL was further aware that CW-1 used
2  USPV to store the proceeds of that business.

3      23.  CW-1 also referred many clients to PAUL, including many
4  bookies from CW-1's illegal gambling organization.  Based on
5  conversations CW-1 had with PAUL, PAUL was aware that these
6  individuals (USPV customers) also earned money from an illegal
7  gambling business, and stored the proceeds of that business at USPV.
8  On one occasion, PAUL asked CW-1 if he/she "had any more bookies"
9  that CW-1 could refer to USPV.  This shows that PAUL was aware of the
10 criminal activities of his clients and was eager to do more business
11 with them.

12     24.  In addition to numerous individuals engaged in various
13 aspects of illegal gambling, CW-1 also referred 1) an individual whom
14 CW-1 personally knew to be a pimp; 2) a cocaine dealer; and 3) an
15 individual involved in facilitating a sophisticated drug trafficking
16 organization.  With regard to the pimp, CW-1 specifically described
17 him as a "pimp" to PAUL and they discussed that he was engaged in
18 promoting high-end prostitution.  Furthermore, CW-1 knows that the
19 pimp in fact rented several boxes at USPV because CW-1 and PAUL
20 discussed the pimp's efforts to negotiate a better price.
21 PAUL told CW-1 that many of his USPV clients were "weed dealers."
22 PAUL told CW-1 that he liked doing business with "weed guys" because
23 they always rented the larger boxes which were more profitable for
24 PAUL.  PAUL made similar statements to CS-1 in late 2019, thus
25 corroborating CW-1's information.  On one occasion before the
26 legalization of marijuana in California, CW-1 specifically referred
27 an individual to PAUL, telling him the guy was "in the green
28

24

**EXHIBIT A**
**43**

1  business," or words to that effect, by which CW-1 meant in the
2  marijuana business.

3      25.  PAUL also told CW-1 that he thought wealthy Beverly Hills-
4  based "Persians" or Iranians were hiding "dirty money" or "revolution
5  money" at USPV.  CW-1 did not know if PAUL had specific conversations
6  with those customers or if he was just speculating.  In either case,
7  however, it shows that PAUL had no objections or qualms about
8  facilitating clients who may have been violating federal or
9  international laws.

10     26.  PAUL was aware that CW-1 was laundering his/her illegal
11 proceeds through the purchase of gold and silver, and encouraged CW-1
12 to do this.  PAUL told CW-1 that he "liked what you are doing with
13 the gold" and "gold is the way to go" with regard to laundering
14 money.  CW-1 also purchased gold for others in order to assist them
15 in laundering their own criminal proceeds.  PAUL was aware of this
16 and handed out business cards advertising CW-1's gold-investment
17 "business," which CW-1 described as a front for laundering money.
18 Furthermore, CW-1 advertised the storage of gold as part of the
19 services of his/her "business" and listed 9182 Olympic Blvd., Beverly
20 Hills, California (location of USPV) as the storage location. PAUL
21 was aware of this and thus participated with CW-1 in the laundering
22 of other people's criminal proceeds.

23     27.  In November 2019, PAUL met with CS-1.  The meeting was
24 recorded and reviewed by investigators.  During the meeting, PAUL
25 told CS-1 that a lot of the USPV clientele came from the cannabis
26 industry and comprised approximately a third of the business at USPV.
27 Additionally, PAUL told CS-1, "Whatever you put in [the vault], I
28 don't want to know."

**EXHIBIT A**
**44**

28. During the same November 2019 meeting, PAUL also made a number of exculpatory statements to CS-1, whom he had just met. For example, PAUL said a number of times that his business was on the up and up; that he paid his taxes; that he declared all the cash he deposited; and that he was in the business of self-storage with a high level of security. Based on my training and experience, criminals who hold themselves out as legitimate businessmen often falsely deny their criminality, particularly with persons they do not know or trust. This has proven to be the case with PAUL, who in subsequent meetings with CS-1, admitted to participation in the marijuana industry and tacit knowledge of money laundering and other criminal conduct by his USPV business partner, Mike POLIAK.

## 2. MICHAEL POLIAK bragged about bringing drug traffickers to USPV as customers

29. On or about December 17, 2019, CS-1 met with Michael POLIAK. The meeting was consensually recorded and reviewed by investigators. During that conversation, POLIAK made the following statements demonstrating his knowledge that criminal proceeds are being stored at USPV:

a. POLIAK told CS-1 that "Mark [PAUL] made no money until I came in. . . . None! . . . For seven years, made nothing. I changed that whole business . . . he was making forty grand a year. With me he makes fifteen thousand a month himself. I turned it from, from three thousand a month to thirty thousand a month[17]. The business. All I did was call marijuana lawyers and they sent me

---

[17] In September 2020, POLIAK told CS-1 that he was the best thing that ever happened to Mark PAUL, in that, prior to his co-ownership of USPV, PAUL was making $60,000 a year as a 100% owner; but now, as a 50% owner, he is making $20,000 a month and the business is growing.

26

**EXHIBIT A**
**45**

1  customers. That's all I did. And those people, I met up with them
2  and they gave me referrals." During this exchange about operating
3  USPV, CS-1 said, "Yeah, he [PAUL] was telling me, like, when, back
4  then, I didn't know you were his partner, he was saying 'my partner'
5  brought in, you know, a lot of marijuana, cocaine people who have,
6  who have money." POLIAK replied, "Yeah." Shortly after, POLIAK
7  said, "When I joined in, this guy [PAUL] had maybe one-third the
8  boxes full. Two-thirds empty. Now it's maybe sixty, sixty-three
9  percent full." This clearly demonstrates not only that POLIAK is
10 aware that marijuana and cocaine proceeds are held at USPV, but that
11 this occurs by design, in order to make the business more profitable.

12         b.    Shortly after the exchange described above, POLIAK
13 added, **"Listen, you don't want every drug dealer in your place**
14 **either. You need normal people too."** The expressed idea that "you
15 need normal people too" suggests that drug dealers comprise the
16 majority of USPV customers, and the business has to make an effort to
17 attract a non-criminal clientele as well, so as not to be too obvious
18 a haven for criminals.

19         c.    While discussing the possibility of opening a second
20 location of USPV, POLIAK said, "You have to pre-sell one third of the
21 place to break even." He asked CS-1, rhetorically, "who's your
22 customer base? Five guys that are laundering money? That's not
23 going to fill the business." CS-1 said, "Not five. I have a lot."
24 POLIAK replied, "Thirty guys? Still not gonna fill a business."
25 This exchange shows that POLIAK is aware of and specifically
26 anticipates USPV customers' use of the vault by criminals who need to
27 launder money. It further shows POLIAK's position that USPV needs to
28

27

**EXHIBIT A**
**46**

1  attract more than money launderers - they also need drug dealers
2  storing cash.

3          d.    In September 2020, POLIAK and CS-1 met again.  That
4  meeting was recorded and reviewed by investigators.  During that
5  meeting, POLIAK told CS-1 that they planned to expand USPV by taking
6  over the Mail Boxes Etc. store immediately adjacent to USPV, further
7  indicating that POLIAK's strategy of bringing in drug
8  dealer/customers has been successful.  Moreover, POLIAK told CS-1 he
9  planned to turn one of two "privacy rooms" inside USPV (used by
10 customers to access their boxes in private) into a separately rented
11 secure space.  POLIAK plans to charge $10,000 a month for the room.
12 With regard to what POLIAK's customer was going to keep in the room,
13 POLIAK said, "I don't know.  I don't ask. But I'm charging ten grand
14 for that little room!  Hundred and twenty grand a year."  CS-1
15 commented that the room could hold $20 million dollars in cash.
16 POILIAK replied, "I really don't care what he do.  He might put gold
17 in there.  I don't know."

18          3.    POLIAK describes PAUL as a legitimate looking "face"
19                for USPV that obscures POLIAK's illegal conduct and
                  ownership of USPV

20          e.    During the December 17, 2019 meeting, which was
21 recorded and reviewed by investigators, POLIAK told CS-1 that he was
22 a customer at USPV for two years before buying in to the business.
23 POLIAK told CS-1, "You know, I wanted Mark, [as a] partner.  I didn't
24 want to do it on my own.  Because again, **I have illegal businesses** at
25 the time, like my vape shit, and I was back doing everything from New
26 York, I wanted a face.  Mark's a great face."  Here, POLIAK admits
27 that he is personally engaged in "illegal businesses" and was storing
28 proceeds at USPV.  In fact, POLIAK told CS-1 he had approximately $8

                                    28

                              **EXHIBIT A**
                                  **47**

1  million stored in six boxes at USPV, and another $2 million which he
2  used to purchase property (discussed later).

3          4.   POLIAK remarks that it is funny that the drug money
              stolen from his business associate, which led to the
4                kidnapping and torture, happened to be stored at SPV

5          f.   During the December 17, 2019 meeting with CS-1,
6  discussed above, POLIAK described in great detail the kidnap and
7  torture event described above.  POLIAK admitted that he was doing
8  business with ALLAN NEYMAN who owned the warehouse and was present
9  throughout the torture.  POLIAK told CS-1, "He [the victim] left the
10  [stolen] money - you want to hear the funny thing?  The money was in
11  my vault!  His wife put the money into my vault."

12  **PROBLEMS WITH CS-3 IN A DIFFERENT CASE**

13     30.   From communicating with other law enforcement officers and
14  AUSAs, I learned that in a different investigation, on more than one
15  occasion, CS-3 exchanged sexts with the target.  CS-3 did not provide
16  these and other communications with the target to his handler. CS-3
17  later admitted to his handler and the government that he had deleted
18  some of his communications with the target that were sexual in
19  nature.  CS-3 failed to follow explicit instructions from a handler
20  on at least one instance, and failed to contemporaneously notify the
21  handler that he was doing so.  CS-3 falsely told the target that CS-3
22  had cancer to induce her to pay CS-3 thousands of dollars for
23  fictitious medical treatments.  CS-3 has informed the handler and the
24  government that he did this in an attempt recover money that CS-3 had
25  advanced on behalf of the target, but this "justification" has not
26  been verified.  CS-3 contacted the target from an unknown phone
27  number and email address, pretending to be other persons in order to
28  buttress his lies about the cancer treatment.  CS-3 failed to notify

1  his handlers of these issues before they came to light, and when
2  initially confronted, did not disclose the full scope of his conduct.
3  There is also evidence that CS-3 fraudulently used another person's
4  credit card.

5      31.  CS-3 has provided information to the DEA since 2018 and,
6  aside from the problems set forth above, has proven reliable.  His
7  work led the seizure of drugs and weapons.  In the instant
8  investigation, CS-3's information has been regularly corroborated by
9  independent sources such as law enforcement database checks, review
10  of other records, recordings, surveillance, interviews and
11  information and operational assistance provided by other Confidential
12  Sources, unknown to CS-3.  As described below, CS-3 was repeatedly
13  paired with an undercover task force officer, who was also a witness
14  to CS-3's undercover work.

15      GEORGE VASQUEZ

16      32.  CS-3 has had numerous conversations with USPV manager,
17  GEORGE VASQUEZ.  Many of those conversations reveal that VASQUEZ is
18  aware that USPV customers engage in unlawful activity and maintain
19  the proceeds of unlawful activity in their USPV safe deposit boxes.
20  Conversations between CS-3 and VASQUEZ on June 28, August 9, and
21  August 22, 2019, were all consensually recorded and reviewed by
22  investigators.  The following examples demonstrate VASQUEZ's
23  knowledge and awareness of the criminal activity which USPV
24  facilitates.

25      33.  On June 28, 2019 CS-3 spoke to VASQUEZ about the purchase
26  of marijuana vape cartridges (discussed more fully herein).  During
27  the conversation, CS-3 said, "I don't know about this shit [vape
28  cartridges].  I'm just the money laundering *mijo*.  The real big thing

30

**EXHIBIT A**
**49**

1 is the other shit [drugs, not marijuana] for me." During this
2 conversation, CS-3 unambiguously stated that he/she is the "money
3 laundering *mijo*." This statement conveys specific knowledge to
4 VASQUEZ that CS-3 is engaged in criminal activity, specifically money
5 laundering. Additionally, CS-3 contrasts his/her ignorance of the
6 cannabis oil business with his/her conduct in "other shit." Based on
7 my training and experience, as well as a comprehensive de-brief of
8 CS-3, CS-3 was referring to hard drugs, not cannabis oil, when he
9 said "The real big thing is the other shit for me." Furthermore, CS-
10 3 believes that VASQUEZ was aware that CS-3 was referring to non-
11 cannabis drug trafficking.

12          5.    VASQUEZ warns CS-3 about "asset forfeiture"

13     34.   On August 9, 2019, CS-3 spoke to USPV manager GEORGE
14 VASQUEZ about difficulties in transporting cash. VASQUEZ told CS-3
15 that USPV owners planned to expand their business into other cities,
16 including Chicago[18]. CS-3 said, "So let me tell you what I'm doing.
17 I can't fuckin' drive with this kind of cash, from fuckin' east coast
18 down here . . . 'cause I get pulled over, just like you just said."
19
20 _____
      [18] Based on my experience investigating drug trafficking and
21 money laundering organizations, I know that drug trafficking and
   money laundering activities are concentrated in certain cities.
22 These include cities on or near the U.S.-Mexico border, such as
   Laredo, San Diego and Los Angles. In addition, other cities
23 throughout the United States serve as "hubs," or center points where
   drug distribution and money collection are concentrated. For example,
24 drugs are often sent to Chicago, Illinois, before being further
   distributed to other cities in the mid-west, such as Cleveland or
25 Milwaukee. Likewise, the proceeds of drug sales are often collected
   and concentrated in Chicago as well. Based on my experience
26 investigating money laundering, I know that millions of dollars in
   drug proceeds are processed through banks in Chicago. Adding a USPV
27 branch in Chicago would likely be profitable in that it would further
   facilitate drug trafficking and money laundering. USPV owner Michael
28 POLIAK expressed this to CS-1 numerous times during conversations
   with him/her in late 2019.
                                  31

**EXHIBIT A**
**50**

1  VASQUEZ added, "Asset forfeiture."  CS-3 continued, "And I just have
2  to fuckin' walk away.  And I'm not trying to take that loss anymore.
3  . . . So anywhere that he's [MARK PAUL] willing, you know, to go in
4  to it [private vault business], I want dibs."  Based on my training
5  and experience, as well as a comprehensive debrief of CS-3, I believe
6  that CS-3 was telling VASQUEZ about the difficulties in transporting
7  drug proceeds (cash) across the United States, and the possibilities
8  of those proceeds being seized by law enforcement.  Further, I
9  believe that VASQUEZ was aware that CS-3 was referring to the
10  transport of criminal proceeds, and his comment, "Asset forfeiture"
11  demonstrates that he is aware that law enforcement can seize and
12  forfeit money that is criminally derived.

13        6.   VASQUEZ explains that USPV would not work in New York
          because anonymous safety deposit box rentals there are
14           prohibited

15    35.  On August 9, 2019 CS-3 spoke to USPV manager GEORGE VASQUEZ
16  about expanding USPV's business.  During the course of the
17  conversation, VASQUEZ explained why USPV's business model would not
18  work in New York.  VASQUEZ said, "You know, we had already talked
19  about several cities, you know.  We tried New York . . . And it can't
20  be like us.  It can't be anonymous and private.  . . . In New York.
21  We tried that.  That's what Mike [POLIAK] wanted first[19].  New York
22  and Jersey and all that area around there."  Based on my training and
23  experience, as well as a comprehensive debrief of CS-3, I believe
24  VASQUEZ is aware of and referencing a New York state law which
25  prohibits operating private safe deposit box vault in the manner that
26
27

28    [19] MICHAEL POLIAK is from the New York and New Jersey area and
relocated to California.

**EXHIBIT A**

USPV operates, with anonymity, the particular quality which appeals to criminals.

7.   VASQUEZ and CS-3 openly discuss drug trafficking, money movement and money laundering

36.   On August 22, 2019, CS-3 spoke to USPV manager GEORGE VASQUEZ about crossing the US-Mexico border.  During the conversation CS-3 asked VASQUEZ, "You drive through? [the US-Mexico border]. VASQUEZ replied, "Yeah."  CS-3 asked, "And they don't sweat you at all?"  VASQUEZ replied, "Not really."  Later in the conversation, VASQUEZ asked CS-3, "Do you go there [Mexico] much?"  CS-3 replied, "I do, but now I got Primo who does that so like I'm not even trying to fuck with any of that . . . he's the one who runs back and forth." Based on my training and experience as well as a comprehensive debrief of CS-3, CS-3 was discussing the challenges of crossing drugs into the United States from Mexico. Further, CS-3 believes that VASQUEZ understood that CS-3 was making references to smuggling drugs across the US-Mexico border.

37.   On August 22, 2019, USPV manager GEORGE VASQUEZ spoke to CS-3 about the need to hide money from both law enforcement and people in one's own organization.  During the conversation CS-3 said, ". . . buddy of mine just got fuckin' hit, not by fuckin' feds but by fuck his own fuckin' team.  And what are you gonna do, call the fuckin' cops?"  VASQEZ replied, "Yeah."  Later in the conversation CS-3 said, "Doesn't even fuckin' trust anyone.  Everybody told him, hey you're stupid, you fuckin', find a stash pad, something." VASQUEZ replied, "Yeah.  That's what happened with Mike [POLIAK]. That's how Mike got here. You know.  He was referred by one of my other clients . . . He's like, hey man, you're getting too big

33

**EXHIBIT A**

1  already . . . You guys go put it away somewhere.  That's how he came
2  by.  Most of my clients are word of mouth, you know?"  Based on my
3  training and experience as well as a comprehensive debrief of CS-3,
4  CS-3 was talking to VASQUEZ about the difficulties in hiding criminal
5  proceeds both from law enforcement and from individuals in one's own
6  criminal organization.  Additionally, VASQUEZ's comments show that
7  USPV co-owner MIKE POLIAK had difficulty finding a place to put large
8  amounts of cash, presumably criminal proceeds.  Finally, VASQUEZ
9  confirmed that most of the USPV clients learn about USPV from other
10  clients, who may also be engaged in criminal activity.

11      38.  On August 22, 2019, CS-3 spoke to USPV manager GEORGE
12  VASQUEZ about needing to move money.  During the conversation CS-3
13  said, "My biggest thing right now is how do I fuckin' move it [money]
14  out.  . . . because I told you, I bought a fuckin' car, but actually
15  it gets old after a while . . . And I can only buy a certain amount
16  of cars before I need a fuckin' dealer's license."  Based on my
17  training and experience as well as a comprehensive debrief of CS-3,
18  CS-3 was talking to VASQUEZ about finding ways to launder criminal
19  proceeds, specifically drug money.  CS-3 referenced purchasing
20  vehicles as a method for laundering criminal proceeds, and the
21  difficulties that poses.  CS-3 believes that VASQUEZ was aware and
22  understood that CS-3 was talking about ways to launder criminal
23  proceeds.

24          8.    VASQUEZ acknowledges the likely storage of drug
                  proceeds at USPV
25
26      39.  During the course of this investigation, agents obtained
    information and operational assistance from an undisclosed
27
28

34

**EXHIBIT A**
**53**

1  Confidential Source ("CS-4")[20].  On or about February 25, 2020, CS-4,
2  who had previously rented a large 10 x 10 box at USPV, spoke to
3  VASQUEZ about a sign at USPV saying they employed the use of drug-
4  sniffing dogs.  CS-4 asked VASQUEZ when was the last time they had a
5  drug dog in USPV, and VASQUEZ said he couldn't remember.

6      **I.  USPV Principals Brokered and Supplied Illegal Drugs (THC and Cocaine) from SUBJECT PREMISES Including USPV**

7
8      40.  In June 2019, CS-3 cultivated a friendly business
   relationship with USPV manager GEORGE VASQUEZ.  During that time, CS-
9  3 spoke to VASQUEZ about purchasing marijuana vaping products.
10 VASQUEZ offered to provide CS-3 with samples of vaping products.
11
12     1.  <u>USPV Manager VASQUEZ displayed marijuana cartridges for sale in the private view room of USPV</u>

13     41.  On June 28, 2019, CS-3 went to USPV in person to obtain the
14 vaping samples from VASQUEZ.  The meeting was consensually recorded
15 and subsequently reviewed by the Affiant.  At approximately 11:40
16 a.m. CS-3 arrived at USPV where he/she was immediately met at the
17 front door by VASQUEZ. VASQUEZ was holding a small cardboard box in
18 his hands and directed CS-3 back to the secure vault. VASQUEZ was
19 armed at the time of this transaction with a semiautomatic pistol
20 that was in an open carry holster on his right hip alongside an
21 unknown type of badge. Investigators have noticed that VASQUEZ is
22 always armed in this fashion during his work hours as part of his

23

24     [20] CS-4 has provided information to the FBI since 2015.
   Specifically, CS-4 has provided information which has identified
25 participants in various money-laundering schemes, as well as the
   methods for pursuing those schemes. CS-4's information and
26 operational assistance have been used in numerous investigations. CS-
   4's information has been corroborated by independent sources such as
27 law enforcement database checks, review of other records, recordings,
   surveillance, interviews and other investigative activity.  CS-4's
28 information has never been found to be false or misleading.  I
   believe CS-4's information is highly credible.

1  purported duties as the security manager for USPV. VASQUEZ and CS-3
2  proceeded to the private viewing rooms in the back of the actual
3  vault.

4      42.  Once inside the room VASQUEZ placed the box on the small
5  desk and opened it revealing six small packages of various sizes with
6  different advertising boxes. CS-3 knew this to be the Butane Hash Oil
7  ("BHO") containing THC vape cartridges he/she was there to acquire
8  from VASQUEZ. The cartridges were packaged differently and displayed
9  different brand names and TCH yields on the packaging. They appeared
10 ready for retail sale in a marijuana dispensary.

11     43.  During the meeting, VASQUEZ said, "So I'll text you the
12 prices right now . . . They're like from ten to seven, the prices."
13 Later VASQUEZ said, "He [the supplier] told me do whatever you want.
14 He can make pretty much whatever you want."  CS-3 asked for
15 information about the product and VASQUEZ said, "that's Danka
16 [brand].  I think that's like seven.  . . . He says the ones that are
17 ten bucks, which is the Brass Knuckles [brand]—" CS-3 said, "Which is
18 probably the good stuff."  VASQUEZ agreed, "The good stuff . . . The
19 good quality . . . these others are kind of cheesy quality. . . . The
20 VSOP and Eurekas are the good stuff . . . so check it out."  CS-3
21 agreed and accepted the samples.

22          2.   USPV Manager VASQUEZ hints that USPV Owner POLIAK is
23               the source of the marijuana cartridges

24     44.  CS-3 then asked about making a larger purchase.  "Like, he
25 [supplier] got supply? . . . like could he produce the numbers?"
26 VASQUEZ replied, "I can tell you this.  He's a partner here."  CS-3
27 and VASQUEZ then discussed having CS-3 speak directly with the
28

36

**EXHIBIT A**
**55**

supplier.  VASQUEZ referred to the supplier as "Mike'," subsequently
identified as MICHAEL POLIAK, co-owner of USPV.

45.  Immediately after the meeting, DEA agents took into custody
six samples of BHO containing THC vape cartridges.  The samples
included 1) Dank Vapes, Green Crack (90.66% THC); 2) Kingpen,
Trainwreck (71.72% THC); 3) Space Vape, V.S.O.P. (98.4% THC); 4)
Eureka, Purple Punch (92.3% THC); 5) Space Vape, Alien Alaskan
Thunderfuck (91.18% THC) and 6) Brass Knuckles, Jack Herer (1000 mg
cannabis distillate).

        3.  <u>USPV Owner POLIAK meets a customer at USPV and then
leads him to the USPV parking lot to view marijuana
cartridges</u>

46.  On July 26, 2019, CS-3 went to USPV to purchase a large
quantity of BHO THC containing vape cartridges.  The meeting was
consensually recorded and subsequently reviewed by the Affiant.
Shortly after arriving at USPV and making contact with VASQUEZ, CS-3
was introduced to MICHAEL POLIAK.  During the conversation, POLIAK
said, "Hey it's [the vaping cartridges] in my trunk, in boxes. . . .
Like five boxes, two hundred each."  About three minutes after
arriving at USPV, agents observed CS-3 and POLIAK in the USPV parking
lot at POLIAK's vehicle, a white 2017 BMW 740i four door sedan
bearing California license plate ██████████████████

████████████████████████████████████████████████

██████████████████).  Agents observed CS-3 and POLIAK transfer five
boxes from POLIAK's vehicle into CS-3's vehicle.

47.  After transferring the boxes, CS-3 and POLIAK went back
inside USPV.  CS-3 asked, "You got a money counter here, right? Yeah,
there it is right there.  Eight."  CS-3 then gave POLIAK $8,000 for
the five boxes, as previously agreed.  POLIAK said, "I can feel money

<div align="center">37</div>

<div align="center">

**EXHIBIT A**
**56**

</div>

1  already."  CS-3 said, "I'll let you know how it goes and I'll put in

2  a bigger one for you, okay?"  CS-3 departed from USPV and provided

3  DEA agents with 1000 units of BHO vape cartridges containing THC that

4  was purchased by from Michael POLIAK and George VASQUEZ at USPV.  DEA

5  took the boxes into evidence, and the DEA Lab determined that the

6  products contained THC.

7         4.    <u>USPV Owner POLIAK sold 1000 marijuana cartridges from
              the parking lot of POLIAK'S RESIDENCE</u>

8

9      48.  On October 31, 2019, CS-3 purchased an additional 1000

10  units of BHO THC-containing vape pen cartridges from USPV owner

11  Michael POLIAK.  The operation was consensually recorded and reviewed

12  by investigators.  CS-3 met POLIAK in the parking lot of ██████████

13  ████████████████████████████ adjacent to the residence of Michael

14  POLIAK.  CS-3 purchased vape pen cartridges with brand name KingPen.

15  KingPen has been identified by the California Department of Consumer

16  Affairs (CDCA), Department of Investigations, as one of the several

17  unlicensed brands of vape pen cartridges that have led to multiple

18  hospitalizations nationwide.  Through this investigation, agents have

19  determined that POLIAK is not a licensed marijuana distributor in

20  California.

21      49.  The cartridges were immediately taken into DEA custody and

22  sent to the DEA lab for analysis, where they tested positive for THC.

23      50.  Additionally, DEA sent eight samples of vape cartridges

24  seized from each of the three transactions described above (June 28,

25  July 26, and October 31) to the California Department of Public

26  Health, Food and Drug Laboratory Branch for additional testing.  The

27  testing showed that five of the eight samples contained Vitamin E

28  acetate oil, which the Center for Disease Control has linked to lung

**EXHIBIT A**
**57**

1  damage and death.[21] This health crisis was particularly acute in the
2  summer and fall of 2019, when POLIAK and VASQUEZ sold these products
3  to CS-3. At least one sample from each of the three transactions
4  tested positive for Vitamin E acetate oil.

5      51. Based on conversations POLIAK had with CS-1 on December 17,
6  2019, which were recorded and reviewed by investigators, POLIAK is
7  clearly aware of the unlawful and dangerous nature of the BHO THC-
8  containing products he was selling. During that meeting POLIAK told
9  CS-1, "I don't have anything. Nothing to move. I shut everything
10 down. I'm not doing anything right now." CS-1 asked, "Why?" POLIAK
11 replied, "I don't want the liability. . . . I mean, enough [money].
12 It's never enough, but I don't want the liability this stage of my
13 life cause I was making vapes. . . . They brought lung diseases now.
14 People are having— there's commercials, you know? I don't need the
15 liability." This demonstrates POLIAK's awareness that the product he
16 was recently selling was linked to "lung diseases" and potential
17 liability. POLIAK also seems to be referring to Public Service
18 Announcements (PSAs) alerting the public to the dangers of marijuana

19

20     [21] See *The New York Times*, "Vaping Illnesses are Linked to
21  Vitamin E Acetate, C.D.C. Says," Denise Grady, November 8, 2019;
    www.nytimes.com/2019/11/08/health/vaping-illnes-cdc.html;

22     "A form of vitamin E has been identified as a 'very strong
    culprit' in lung injuries related to vaping THC, health officials
23  reported on Friday, a major advance in a frightening outbreak that
    has killed 40 people and sickened 2,051. . . . The outbreak has
24  revealed the existence of a vast, unregulated, shadowy marketplace of
    illicit or bootleg vaping products that are essentially a stew of
25  unknown chemicals concocted, packed and sold by unknown manufacturers
    and sellers. . . . Hundreds of state and federal health
26  investigators have been deployed to find out what has cause such
    extensive damage to patients' lungs, which researchers have likened
27  to the chemical burns suffered by soldiers attacked with mustard gas
    in World War I. . . . Many of the products used by those who became
28  ill were illicitly obtained, public health experts have said, by
    patients who bought them from friends or on the street."

                                39

**EXHIBIT A**
**58**

1  vape products.  Additionally, during a discussion about the
2  kidnap/torture event (discussed above), POLIAK said, "He [NEYMAN] was
3  the one selling the cartridges and the packaging.  Not the oil, you
4  know?  I would make my own oil and inject."  Because the oil itself
5  is believed to be causing the lung damage, POLIAK effectively
6  admitted his role in manufacturing this dangerous product.

7          5.  <u>USPV Owner POLIAK discussed with a USPV customer
                selling flavored cocaine while at POLIAK'S RESIDENCE</u>
8
9      52.  In October 2019, CS-3 and USPV co-owner MICHAEL POLIAK
10  first discussed the sale of "flavored cocaine" or "Flavado."  On or
11  about October 11, 2019, CS-3 and POLIAK met for lunch.  After lunch,
    they returned to POLIAK's RESIDENCE at ████████████████████████
12
    ██.  While approaching POLIAK's unit, they passed the mailboxes and
13  POLIAK commented to CS-3 about the cocaine residue on his mailbox
14  key.  POLIAK explained that he uses the key routinely to snort
15  cocaine, and the key therefore has coke residue.  CS-3 expressed an
16  interest in purchasing cocaine.
17
       53.  POLIAK then told CS-3 about "Flavado," with which CS-3 was
18  unfamiliar.  POLIAK described it as flavored cocaine which softens
19  the drug's effects, without diluting them.  POLIAK told CS-3 that
20  women love it and he recommended the strawberry flavored coke.  CS-3
21  expressed an interest in purchasing flavored cocaine.  POLIAK called
22  "Casey" in the presence of CS-3 and identified "Casey" as the person
23  who could "hook [CS-3] up."  POLIAK told CS-3 that he would connect
24  CS-3 with Casey when CS-3 was ready to buy, and CS-3 should just let
25  POLIAK know.
26
       54.  On or about November 5, 2019, CS-3 contacted POLIAK and
27  asked him if he could hook CS-3 up with Casey in order to purchase
28

                                    40

                              **EXHIBIT A**
                                  **59**

1 | the flavored cocaine they had previously discussed.  POLIAK asked how
2 | much CS-3 needed and CS-3 told him he was looking for "a zip" [one
3 | ounce].  POLIAK told CS-3 that Casey didn't sell it like that-- he
4 | breaks it down into per-use quantities.  CS-3 asked for $1000 worth
5 | and POLIAK agreed.

6 | 55.  On or about November 15, 2019, CS called POLIAK to follow-
7 | up on the requested cocaine purchase.  POLIAK advised that he was
8 | having family issues he was dealing with, and didn't have time to
9 | arrange the deal.

10 | 56.  On or about December 11, 2019, CS-3 and POLIAK again
11 | discussed the purchase of flavored cocaine.  During that phone
12 | conversation, POLIAK suggested CS-3 communicate with him using a
13 | wireless application called "Signal."  CS-3 agreed, and further
14 | discussion about the flavored cocaine purchase occurred over Signal,
15 | an encrypted application popular with drug traffickers. POLIAK and
16 | CS-3 continued to discuss the cocaine deal over Signal, often
17 | including the third-party supplier; however, POLIAK never allowed CS-
18 | 3 to deal directly with anyone – POLIAK was always involved.  CS-3
19 | believes this was intentional in order for POLIAK to protect his
20 | financial cut in the deal.

21 |     6.  USPV Owner POLIAK set up a cocaine deal at USPV, but
22 |        then moved it when USPV Manager VASQUEZ Objected to
       the location

23 | 57.  On or about December 16, 2019, POLIAK told CS-3, "Come to
24 | the vault [USPV]; we'll do it [cocaine deal] here."  CS-3 agreed.
25 | However, a little later, George VASQUEZ called CS-3 and expressed his
26 | objection to CS-3 and POLIAK conducting a cocaine deal at USPV.
27 | VASQUEZ felt that POLIAK was not being careful and that he was
28 | possibly bringing unwanted attention from law enforcement onto the

41

**EXHIBIT A**
**60**

1   business.  VASQUEZ told CS-3 to "do the deal quickly - pick it up and
2   get out of here," or words to that effect. Shortly after, POLIAK
3   contacted CS-3 and said they could not do the deal at USPV.

4       58.  On or about December 18, 2019, in a conversation with CS-3,
5   which was recorded and reviewed, POLIAK instructed CS-3 to meet with
6   an unknown associate of his at █████████████████████████
7   ████████ in order to obtain one ounce of flavored cocaine.  CS-3
8   was able to make arrangements for a DEA Task Force Officer, working
9   in an undercover capacity ("TFO-UC"), and posing as an associate of
10  CS-3, to make the purchase for $2,200.  TFO-UC arrived at the
11  location and met with an individual who was later identified as
12  Daniel SAVAGE and obtained a quantity of suspected cocaine in a white
13  shopping bag, hidden beneath a pair of black gym shorts.  DEA agents
14  took custody of the suspected cocaine which was in a clear plastic
15  sandwich baggie that had been tied in a knot.  The white substance
16  and the sandwich baggies weighed 29 grams.  The suspected cocaine was
17  sent to the DEA lab for processing.  The substance tested positive
18  for cocaine HCL.

19      **J.   USPV Owner Mark PAUL Leases Property for the Purposes of
20           Manufacturing, Producing and Distributing Controlled
             Substances**

21      59.  On or about February 20, 2020, PAUL met with CS-1.  The
22  meeting was consensually recorded and reviewed by investigators.
23  During that meeting, PAUL told CS-1, "I've been doing cannabis
24  deals," but then described himself as "just a landlord."  PAUL went
25  on to describe one location as an "amazing property" that everyone in
26  the marijuana business wanted because of its location.  However, it
27  was located near a Gymboree - a business which falls under California
28  Health & Safety Code 11362.3(3), prohibiting marijuana possession

**EXHIBIT A**
**61**

within 1,000 feet of a school, day care or youth center – so no one in the cannabis business could buy the location.  PAUL then explained how he bought the Gymboree, left the signage in place, and then bought the "amazing property" for the dispensary.  He did not remove the Gymboree sign until the dispensary was open for business. PAUL told CS-1 that he paid $250,000 for the Gymboree (which he closed), and $4.5 million for the other property, as well as $700,000 in improvements.  PAUL told CS-1 that he earns $62,000 a month renting the property to the dispensary owners[22].

60.  During the same consensually recorded meeting in February 2020, PAUL said, "I have another deal – I have a dispensary--" then he stopped speaking abruptly, as though he thought better of admitting that he had a marijuana dispensary.  PAUL then changed the focus of his comments to the company in Oregon rather than his role. PAUL went on to describe "the largest marijuana processing company in Oregon" with whom he partnered.  PAUL told CS-1 that this business could process 5 to 10 million pounds of marijuana a month with the use of a kiln that quickly dries wet hemp.  Further, he told CS-1 that the group was conducting $2 million a month in business, but had contracts for $10 million a month that they could not meet.  PAUL told CS-1 that he invested $5.5 million in the business.

---

[22] Based on specific descriptions, agents have identified the marijuana dispensary as The Atrium at 5441 Topanga Canyon, Woodland Hills.  Mike POLIAK corroborated PAUL's association with this business to CS-1 in September 2020, telling CS-1 that PAUL purchased land "up north" for a marijuana grow, but refused to finance the equipment.  Now, according to POLIAK, PAUL's partners are having trouble paying the lease on the land, their "finance guy" has taken over the Atrium dispensary, and there is a power struggle for control.

43

1      61.  On or about April 22, 2020, CS-4 spoke with George VASQUEZ

2  while at USPV to pay rent on a safe deposit box.  This conversation

3  was not recorded, but was reported to the Affiant immediately after

4  it occurred.  VAQUEZ informed CS-4 that "his boss" recently purchased

5  six or seven hundred acres in Colorado for the cultivation of

6  marijuana and was looking for individuals interested in providing

7  security.  Based on conversations VASQUEZ has had with CS-3 and CS-4,

8  VASQUEZ refers to Mark PAUL as his boss.

9      62.  During the course of this investigation, investigators

10  reviewed and analyzed PAUL's business, banking and financial

11  activity.  PAUL's businesses include MJ Real Estate Investors Inc.

12  ("MJRE")[23], a marijuana real estate investment company; Emerald Fund,

13  LLC; Bachelor Valley Fund LLC; and Mark Paul Holdings, Inc.  An

14  analysis of banking records shows over $700,000 in transactions

15  between MJRE and Antares Topanga Group, LLC, aka Valley Collective

16  Care, which public records show doing business as The Atrium, a

17  marijuana dispensary.  MJRE also conducts business with Emerald Fund

18  LLC (both owned by PAUL).  Emerald Fund remitted funds for a 67-acre

19  purchase in Oregon. Emerald also has financial transactions with

20  Rogue Bioscience, a Medford-Oregon based industrial hemp processor.

21  Bachelor Valley Fund has financial transactions with a company in

22  Denver, Colorado. This analysis supports statements PAUL and VASQUEZ

23  made to CS-1 and CS-4.

24      63.  Based on information provided by the California Department

25  of Consumer Affairs - Cannabis Enforcement, which enforces marijuana

26

27

28      [23] USPV former owner and OLYMPIC GOLD & JEWELRY owner, Steve
BARTH, is also a principal at MJRE.

44

**EXHIBIT A**
**63**

laws in California, PAUL is not licensed to "have a dispensary" or otherwise participate legally in the cannabis industry.

**K.     USPV Owner Michael POLIAK is a Professional Criminal**

POLIAK's Criminal Activity

64.   In addition to brokering a cocaine deal for CS-3 and selling 1000 units of BHO THC-containing vape pen cartridges on two occasions (discussed above), POLIAK continues to engage in criminal activity.   The following examples demonstrate this:

1.   POLIAK studied how to commit deceptive online marketing

a.   During a December 2019 meeting with CS-1, which was recorded and reviewed by investigators, POLIAK described a possible new business deal, which involved fraud: "I have a guy that's a master at driving traffic on-line.  . . . But he does deceptive marketing.  He'll fake some shit, like he'll put Dr. Oz promoting his product or Ellen [DeGeneres] or some shit like that.  And he'll sell the fuck out of it, but you burn a lot of merchant accounts. . . . But merchant accounts is the problem.  It's – you burn a lot of them. You constantly need a flow of merchant accounts.  Cause the [credit card] charge-backs are gonna be like crazy."  POLIAK advised that he had a business meeting arranged with this person for the following day, in order to learn how to take over his business, before he goes to jail[24].  In January 2020, POLIAK introduced CS-1 to Allen NEYMAN, and they discussed possible business deals.  That meeting was recorded and reviewed by investigators.

---

[24] The person running the fraud scheme as described by POLIAK is ALLAN NEYMAN who was involved with the torture/kidnapping discussed above.

45

**EXHIBIT A**
**64**

1              2.    POLIAK's Paycheck Protection Program scheme

2         b.    On or about September 15, 2020 CS-1 met with POLIAK.

3 The meeting was consensually recorded and reviewed by investigators.

4 During the meeting, POLIAK described obtaining almost $70,000 from

5 Payroll Protection Plan (PPP) for his "employment" at MGP Management.

6 POLIAK admitted to CS-1 that he only made $1,000 a month, and didn't

7 have any employees, but submitted an application and received

8 $68,700. When CS-1 asked how he did it, POLIAK replied "Cause I

9 filed. That I had hardships." Additionally, POLIAK applied for and

10 received three SBA (Small Business Administration) loans for his

11 other businesses, though he acknowledged they were loans. POLIAK

12 described them as "free money," and at an interest rate of 3.75%,

13 could earn more than that through one of his "investments."

14 Throughout this conversation, POLIAK bragged to CS-1 about committing

15 fraud.

16              3.    POLIAK's marijuana trafficking

17         c.    On or about January 27, 2020 CS-1 met with POLIAK.

18 The meeting was consensually recorded and reviewed by investigators.

19 During the meeting, POLIAK spoke to Memory Buss using the speaker

20 function on his cell phone. CS-1 witnessed both sides of the

21 conversation. Based on my review of the conversation, as well as

22 information provided by the California Department of Consumer Affairs

23 ("CDCA"), Buss is licensed under CalCannabis for Provisional Adult

24 Use - Nursery; Processor; and Specialty Indoor - but not retail or

25 manufacturing. Further, POLIAK leases property in Los Angeles which

26 he subleases to Buss for use in her Cannabis business.

27         d.    Buss recently ended a partnership in her Cannabis

28 business because her partners were operating outside the law. She

46

**EXHIBIT A**
**65**

1  told POLIAK, "I'm staying compliant by getting rid of them.  I would
2  have lost my license if they would have stayed because they broke the
3  law so many times."

4          e.    During the conversation, POLIAK offered to sell Buss
5  filling machines for $5,000 each.  He first denied having any, "I
6  just got rid of everything when I closed out.  They weren't legal
7  anyway."  But then he said, "I have three laying around," which she
8  asked to buy.  Based on information provided by CDCA, "filling
9  machines" are outside the scope of Buss's license; POLIAK is not
10 licensed to possess these machines at all.

11         f.    POLIAK also offered to broker the sale of 20,000 pre-
12 rolled joints.  While POLIAK was adamant that he did not want to
13 "hold" more than a few samples -"you can drop off samples.  But I
14 don't need to store fuckin' tons of shit.  A couple samples, yeah, no
15 problem.  I'll just hand it over to the guy."  As the conversation is
16 wrapping up, POLIAK tells Buss to bring the samples and he'll give
17 them to a couple of guys.

18         g.    This demonstrates POLIAK's on-going business dealings
19 in the marijuana industry which are outside California law, as he is
20 not licensed.

21             4.    USPV Owner POLIAK bragged about his drug cartel
                     connections
22
23 65.    In December 2019, POLIAK discussed with CS-1 his various
24 business deals, including one involving the import of produce from
25 Mexico.  During that conversation, which was recorded and reviewed by
26 investigators, POLIAK told CS-1 that he was affiliated with the
27 Beltran-Leyva drug cartel.  During a conversation, CS-1 said, "These
28 guys [referring to CS-1's phone], their mother is from cartel."

**EXHIBIT A**
**66**

1  POLIAK responded, "That's how I am. I'm Beltran.  Beltran are my
2  people.  Google Beltran, you'll see how big they are.  Guadalajara."
3  POLIAK then told CS-1 that the cartels control everything in Mexico
4  and you can't work there without them.  POLIAK's self-proclaimed
5  association with a well-known Mexican drug cartel suggests his
6  participation in money laundering or drug trafficking.  While POLIAK
7  refers to the subject of this business as involving "produce" or
8  "avocadoes," based on my training and experience, produce is often
9  used by Mexican drug cartels as a "cover" load to disguise transport
10 of drugs or currency.

11      66.  During the course of this investigation, agents have
12 obtained and reviewed financial records related to USPV principals,
13 including records related to Michael G. POLIAK and numerous business
14 entities associated with him (e.g. MGP Consulting, MGP Management).
15 A review of financial records associated with MGP Consulting revealed
16 a January 25, 2019 check for $125,000 payable to AA Consulting Group,
17 Inc.  Public records show that AA Consulting Group, Inc. belongs to
18 Aram Abgaryan, who was arrested and charged with murder in October
19 2019.  Those charges stem from Abgaryan's involvement in an explosion
20 at a sophisticated cannabis extraction plant in Chatsworth,
21 California, which resulted in the death of one of the participants[25].

22
23
   _____
24 [25] See www.nbclosangeles.com\news, "Five Men Charged For Deadly Honey
   Oil Lab Explosion in Chatsworth," October 31, 2019.
25
   "Five men have been charged with murder following a deadly explosion at an illegal honey oil lab in
26 September that killed a man they were working with, authorities announced Thursday.
27
   The defendants and the victim had been operating a lab in Chatsworth, where they extracted THC, the
28 high-inducing chemical found in marijuana, from cannabis plants for at least two months, the Los

                                    48

                            **EXHIBIT A**
                                **67**

1   That POLIAK was participating in this illegal and dangerous
2   enterprise is supported not only by the check he wrote to AA
3   Consulting, but by statements he made to CS-1 in December 2019.  In a
4   conversation between POLIAK and CS-1, which was recorded and reviewed
5   by investigators, POLIAK described an "unlucky" guy who used to "make
6   oil" for him using solvents.  According to POLIAK, the man had a
7   heart attack prior to the chemical explosion, but the others were
8   being charged with murder anyway because the death occurred during
9   the commission of a crime.

10   POLIAK's Money Laundering

11   67.   In multiple conversations with CS-1, which were
12   consensually recorded and reviewed by investigators, POLIAK admits to
13   laundering money, often referring to money as "clean" or "dirty," and
14   speaking plainly about the need to "clean my money."  The following
15   provide specific examples from conversations between CS-1 and POLIAK:

16
17   _____

18   Angeles district attorney's office said in a statement.

19   The lab exploded Sept. 21 while four of the men and the victim, Dados Aroutiounov, 62, were inside.
     Aroutiounov's remains, burned beyond recognition, were found the following day under a pile of debris
20   after investigators received information that someone may have been killed in the fire.

21   The cannabis allegedly was being turned into a potent concentrate known as hash oil or honey oil that
     can be used in vape pens, edibles, waxes and other products.
22

23   A rise in vaping illnesses nationwide has caused federal investigators to probe the black market for
     THC products, especially illegal vaping cartridges.
24
     Aram Abgaryan, 30, Vadim Klebanov, 59, Arsen Terejyan, 43, Rafael Mailyan, 32, and Stepan
25   Mailyan, 65, were arrested Tuesday and charged with murder and manufacturing a controlled
     substance, concentrated cannabis. Authorities also seized $3.2 million and gold bars Tuesday from a
26   storage unit connected to the case.

27   Each faces 23 years to life in prison. They remain in jail on $2 million bail."

28

49

**EXHIBIT A**
**68**

a.   During a meeting in December 2019, POLIAK told CS-1
that he has monthly income in the form of a $50,000 check.  "I get
checks for fifty-thousand a month.  Forty-five gets me fifty."  Later
in the conversation, CS-1 asked, "But how do you have fifty a month?"
POLIAK replied, "I'm telling you, between like all my things I'll
make like six hundred this year."  CS-1 asked, "You give them cash,
they give you check, is that what—"  POLIAK replied, **"No, no that's
just to clean my money . . . that I don't even count as income.**"

### 5.   USPV Owner POLIAK admits he uses a shell business to launder money

68.   POLIAK further discussed both the "forty-five-for-fifty"
deal, and other aspects of money laundering with CS-1 on or about
January 27, 2020, during a meeting which was recorded and reviewed by
investigators.  After a detailed description of his involvement in
the cannabis industry, POLIAK said, "I took home 200-something
thousand in key money and ten thousand a month income every month."
CS-1 asked, "So how do you manage, where do you put your money?"
POLIAK exclaimed, "I own a vault!"  CS-1 asked, "I'm not talking
about the cash."  POLIAK replied, "It's all cash!  It's all cash.
Why do you think I bought the vault?"   POLIAK then described some of
his shell corporations: "I have MGP. **Because I have to clean the
money.**  Put money into MGP so I can pay half the rents.  Half the
rent is in cash and half the rent is clean."

69.   Later in the same conversation with CS-1, POLIAK said, "I
wash $50,000 through my consulting.  Remember, I pay 45 for 50?"
POLIAK continued, "So fifty thousand--" CS-1 finished, "you put into
MGP."  POLIAK corrected, "No, I put into MGP Consulting.  MGP
Consulting pays MGP Management for rent.  Talking about $10,000 a

50

**EXHIBIT A**
**69**

1  month.  And that goes to the landlords." CS-1 said, "So you're paying
2  the landlords--" POLIAK finished, "--through my consulting." CS-1
3  said, "So you're getting paid cash . . . you give some fucker cash--"
4  POLIAK finished, "He cuts me a check.  Fifty thousand for forty-five
5  cash."  It is important to note POLIAK's use of various shell
6  corporations such as MGP Management and MGP Consulting.  Based on my
7  training and experience investigating money laundering organizations,
8  I know that it is common for criminals to create multiple "shell"
9  corporations to "layer" criminal proceeds, thereby obscuring their
10 criminal origins.  Additionally, in this exchange, POLIAK again
11 openly admits cleaning his money, something which does not need to be
12 done with lawfully earned income.
13     70.  A review of Michael POLIAK's bank accounts (specifically
14 MGP Consulting) corroborates his description of this activity.
15 Between February 15, 2018 and January 2020, MGP Consulting received
16 $50,000 a month (forty-two $25,000 checks) from Corporation A and
17 Corporation B, both owned by the same individual.  I learned through
18 conversations with FBI agents that the individual is the target
19 subject of a current FBI Healthcare Fraud investigation (hereafter TS
20 HCF)[26].  TS HCF's signature is on checks from both companies.  Based
21 on conversations I've had with agents who investigate healthcare
22 fraud, I know that those engaged in healthcare fraud schemes often
23 need cash and will pay a premium for it (e.g. $50,000 for $45,000 in
24 cash) because they need to make cash payments to "patients" seeking
25 healthcare services which are being over-billed.  They cannot
26
27     [26] FBI agents who are investigating TS HCF asked that the
   identity of the target of their investigation, as well as his/her
28 related business entities, remain undisclosed in order to protect the
   integrity of their investigation.

withdraw the amount of cash they need without bringing attention to their scheme.  This leads them to look for other sources of cash.

71.  POLIAK has a large amount of cash which he stores at USPV. On or about December 17, 2019, CS-1 met with Michael POLIAK.  The meeting was consensually recorded and subsequently reviewed by investigators.  During the meeting POLIAK told CS-1 that as a customer of USPV (prior to buying in to the business), POLIAK had four boxes at USPV.  He further stated that he now has "six boxes in the place myself!  I was a customer.  I'm telling you, I have six ten-by-tens myself."  POLIAK added, "Let me put it this way, the reason also why I wanted to buy it [USPV], I got a lot of fucking money now."  Earlier in the conversation, POLIAK said, "I wish I had fifty [million] right now.  That would be nice."  CS-1 replied, "Yeah?  In your twenties or what?"  POLIAK said, "No, not even, bro. Like ten.  . . .  I have like **two clean, eight like dirty**.  I put most of it in the house."  Based on my review of the recording and a debrief of CS-1, I believe that POLIAK has $10 million: $2 million which he laundered through the purchase of property (discussed below) and $8 million in cash stored in six 10 x 10 boxes at USPV. Additionally, POLIAK himself describes the $8 million as "dirty," by which I believe he means it was not legally derived and in the form of cash - not laundered to appear legitimately earned.

72.  Based on my training and experience, my review of bank records and recordings, I believe that the cash POLIAK is sending to TS-HCF is the proceeds of his self-professed "illegal businesses," likely drug trafficking, which he stores at USPV.  Thus, drug trafficking proceeds are being used to further healthcare fraud; and

**EXHIBIT A**
**71**

1  the fraud proceeds are being further laundered by POLIAK to make
2  purchases (such as USPV) and advance his other criminal interests.

3      73.   Michael POLIAK described efforts to launder his money
4  through a real estate purchase to CS-1.  On or about December 17,
5  2019 and again on September 15, 2020, Michael POLIAK met with CS-1.
6  The meetings were consensually recorded and reviewed by
7  investigators.  During those meetings, POLIAK described to CS-1 his
8  plans to launder cash through the purchase, renovation and sale of
9  property located at ██████████████████████████████████.

10     74.   During the earlier conversation, POLIAK told CS-1 that the
11 property was listed at $2 million, but he offered the sellers $1.7
12 million "tomorrow – no inspection."  POLIAK said, "I literally did
13 one day close. Can you imagine?  One day close?"  In the subsequent
14 meeting, POLIAK further explained that he put $600,000 down and took
15 out a mortgage of about $1.2 million[27].  He also told CS-1 that he
16 spent about $1.5 million renovating the property.

17     75.   In September 2020, with renovations complete, POLIAK told
18 CS-1 he was listing the property for $3.6 million, but expected a
19 bidding war.  POLIAK believed the property was worth closer to $4
20 million.

21     76.   With regard to the property purchase and massive renovation
22 under way when CS-1 first saw the property in December 2019, CS-1
23 commented, "You could, basically what you could do is, one-point-
24 seven, you could easily clean your money through it."  POLIAK
25 replied, "That's what I'm doing with the construction.  Why do you
26 think I'm doing half a million construction?"  CS-1 said, "Half a

27 

28     [27] This is supported by financial analysis which revealed a
   mortgage on this property.

53

**EXHIBIT A**
**72**

1  million cash."  POLIAK said, "I want to do one or two projects like
2  this a year."  CS-1 said, "That's a million dollar give-away.  And
3  you-" POLIAK interrupted, "Ten-thirty-one-exchange[28]."  POLIAK added,
4  "And I can wash it off the construction company.  On top of the ten-
5  thirty-one exchange."  CS-1 asked, "You're giving him cash?" POLIAK
6  said, "I write off Jacob," referring to his contractor.  CS-1 said,
7  "Yeah, you take his check.  You give him cash."  POLIAK said, "Yep.
8  . . . We do profit sharing . . . Yeah, on the house.  It's gonna be
9  like this and it comes back clean . . . I pay all his subs in cash.
10  I've been paying all his subs in cash all year already."

11      77.  It is worth noting that POLIAK himself uses phrases such as
12  "I can **wash** it" and "it comes back **clean**," showing his own awareness
13  and acknowledgement of money laundering.  Additionally, when CS-1
14  says "you could easily **clean** your money through it," POLIAK eagerly
15  agrees, saying "That's what I'm doing with the construction.  Why do
16  you think I'm doing half a million construction?"  Finally, by
17  admitting that he is paying sub-contractors ("subs") in cash and has
18  been doing so all year, POLIAK is specifically describing how he uses
19  (illegal) cash to increase the value of his property which he will
20  later sell for a profit and claim as legitimate income, thus
21  "cleaning" his "dirty" money.

22      78.  Finally, during their September 2020 meeting, which was
23  recorded and reviewed, CS-1 inquired whether POLIAK's asking price
24  would be reduced if a buyer came in with a million or two million in
25  cash.  POLIAK told CS-1 he would require "a premium" if someone came

26

27  _____

28  [28] A 1031 Exchange refers to section 1031 of the IRS Code which
allows a real estate investor to avoid capital gains taxes as long as
the profit is used to purchase another "like kind property."
54

**EXHIBIT A**
**73**

in with cash – he would charge $4.2 million.  "I don't— Nobody needs cash.  . . . I have a ton of cash.  . . . I'm doing business to get rid of my cash."  This further demonstrates POLIAK's on-going efforts to laundering money through his various projects.

**L.   USPV Owner Michael POLIAK Used Criminal Proceeds to Buy His Interest in USPV**

79.   In April 2019, Michael POLIAK purchased a 50% ownership in USPV.  POLIAK described the deal to CS-1 in a consensually recorded conversation which investigators reviewed.  During that conversation, CS-1 asked, "How did you meet him [PAUL], turn around and become a partner? . . . Did you have to pay him?"  POLIAK replied, "Yeah, I gave him $475,000.  . . . two-seventy-five clean.  Two hundred dirty."  Later in the conversation, POLIAK explained, "Mark [PAUL] owned 75%.  Hillary [BARTH] and her husband [STEVE BARTH] owned 25%. I bought twenty-five from Mark, and I bought twenty-five from them. I said, 'Mark, I can't buy the place unless I get at least 50%.'"

80.   A review of bank records supports POLIAK's claim.  On April 2, 2019, $225,000 was deposited into USPV's JP Morgan Chase bank account ending in #7511.  The deposit included a Wells Fargo Bank cashier's check in the amount of $125,000, payable to U.S. Private Vaults, purchased by Michael POLIAK; and a check issued from Michael POLIAK's Wells Fargo Bank account #7496 in the name of MGP Consulting LLC, for $100,000, payable to U.S. Private Vaults.  Based on POLIAK's statements, agents believe that the remainder of the $475,000 was paid in cash.  Agents also believe STEVE BARTH and HILLARY BARTH were paid in cash.

81.   As set forth above, there are numerous factors which indicate that all of POLIAK's income is derived from illegal sources.

**EXHIBIT A**
**74**

The cash in particular cannot be sourced to any lawful pursuit. However, close examination of POLIAK's bank records reveal the following:

    a.    The check for $100,000 from MGP Consulting LLC, can be traced to healthcare fraud, as described above. Between February 15, 2019 and April 1, 2019, POLIAK received three checks from Corporation A, and one from Corporation B., each for $25,000, payable to MGP Consulting. These checks are part of the "forty-five-for-fifty" healthcare fraud/money laundering scheme POLIAK himself described. These deposits funded the $100,000 check from MGP Consulting to U.S. Private Vaults.

    b.    In addition, the $125,000 cashier's check from POLIAK's Wells Fargo account can be traced to a $300,000 E-deposit made in New York on 10/20/2018. Financial investigators traced this check to Alta Quality Growers, LLC of Elgin, Illinois, whose principal is John Fasano of Brooklyn, NY. Fasano has a criminal history which involves drug trafficking (marijuana and ecstasy), as well as a financial history which includes a pattern of structured deposits and withdrawals and large wires to Mexico, with no business purpose. Additionally, Alta Quality Growers, LLC has no website and little internet presence. It's notable that the company, supposedly located in Illinois, has a (956) area code phone number - 956 covers much of the Texas-Mexico border. Based on my training and experience in both drug and money laundering investigations, I believe that Alta Quality Growers, LLC is a drug/money laundering front. The money therefore which funded POLIAK's Wells Fargo Bank account and was used in part to purchase USPV, is likely also criminal proceeds.

**EXHIBIT A**
**75**

**M.  None of the Individuals Associated with USPV, as Principals or Patrons, who are Participating in the Marijuana Industry, is Licensed by the State of California to do so.**

82.  During the course of this investigation, federal agents consulted with the California Department of Consumer Affairs, Cannabis Enforcement.  Through that consultation, we learned that none of the following individuals is licensed to participate in the California cannabis trade, either with regard to cultivation, manufacture, or retail[29]:  MARK PAUL, MICHAEL POLIAK, GEORGE VASQUEZ, STEVE BARTH, HILLARY BARTH, Allan NEYMAN, Matthew BEAVER, Aram ABGARYAN, Alta Quality Growers, John FASANO.

**N.  USPV Principals Have Counseled Clients on Strategies to Circumvent BSA Reporting Requirements and Have Themselves Failed to Comply with Reporting Requirements**

> 1.  USPV Manager VASQUEZ instructs a customer to structure gold purchases to avoid currency transaction reports

83.  On August 9, 2019, CS-3 talked to USPV manager GEORGE VASQUEZ about buying gold at OLYMPIC GOLD & JEWELRY.  The conversation was consensually recorded and reviewed by investigators.  During the conversation, CS-3 said, "My Primo's gonna want to talk to her [HILLARY BARTH] because we spoke about buying some gold. . . . He [Primo] needs to get rid of a lot of shit . . . and I'm hoping you guys have some fuckin' creative ideas on how to do it."  VASQUEZ clarified, "Well, depends on—what—okay—he's got to get rid of some money?"  CS-3 replied, "Yeah."  VASQUEZ said, "He wants to buy gold?"  CS-3 said, "Yes."  VASQUEZ said, "Okay. **Keep it at under ten thousand dollars**."  CS-3 asked, "How often?"  VASQUEZ replied, "About – I would—it's, it's supposed to be every 24 hours . . . but I

---

[29] Valley Collective Care (Antares Topanga Group) which operates The Atrium at 5441 Topanga Canyon Blvd., Woodland Hills, CA, discussed herein is a licensed cannabis retailer.

57

**EXHIBIT A**

**76**

1  suggest at least 48 hours." VASQUEZ added, "Yeah. But not all the
2  time. **So let's say like 9,000 or 9,500."** CS-3 said, **"Break it**
3  **down."** VASQUEZ replied, "Break it down . . . Cause **you don't want**
4  **that paperwork shit."** (Emphasis added.) Based on my training and
5  experience, as well as a comprehensive debrief of CS-3, CS-3 was
6  talking to VASQUEZ about laundering criminal proceeds through the
7  purchase of gold. Furthermore, I believe that VASQUEZ understood
8  that CS-3 was talking about laundering criminal proceeds. Finally,
9  it is indisputable from this conversation that VASQUEZ was coaching
10 CS-3 how to "structure[30]" his purchases in order to avoid the Bank
11 Secrecy Act (BSA) reporting requirements, specifically telling CS-3
12 to "keep in under $10,000" because "you don't want that paperwork
13 shit."

14     84.   In addition to coaching CS-3 on how to avoid BSA
15 requirements, VASQUEZ's statements show a clear knowledge of and
16 participation in money laundering. USPV is using its co-located
17 business, OLYMPIC GOLD & JEWELRY as an outlet for USPV customers to
18 launder criminal proceeds, by exchanging cash for gold or silver.
19 That there is a pattern and practice of this is evidenced by the
20 seizure of gold and silver from USPV boxes in the cases described
21 earlier. Furthermore, based on my training and experience
22 investigating money laundering, I know that the purchase and sale of
23 gold and silver is a common method which criminals employ to launder
24 criminal proceeds. Gold and silver are difficult to trace, portable,
25
26 ──────────────
27     [30] Structured deposits refers to multiple deposits under $10,000,
   made on the same day or consecutive days, which add up to over
   $10,000 - generally structured in order to avoid Bank Secrecy Act
28 (BSA) requirements, such as providing identification and filing a
   Currency Transaction Report (CTR) or IRS Form 8300.

**EXHIBIT A**
**77**

1 fairly easy to re-sell, and often traded in a manner which, like
2 USPV, caters to criminals' need for anonymity.

3           2.    HILLARY BARTH and VASQUEZ instruct a customer to
                  structure gold purchases to avoid currency transaction
4                 reports

5       85.   On or about January 13, 2020 CS-4 went to USPV to pay rent
6 on a previously-rented safe deposit box.  While there, CS-4 spoke to
7 HILLARY BARTH about the possibility of investing approximately
8 $20,000 in gold or silver.  This conversation was not recorded, but
9 was reported to the Affiant immediately after it occurred.  HILLARY
10 BARTH, who had never previously met CS-4, told CS-4 that it didn't
11 matter whether CS-4 purchased gold or silver – one came in coins, the
12 other in bars – but he/she should not purchase $20,000 at one time.
13 HILLARY BARTH specifically advised CS-4 not to purchase more than
14 $10,000 worth of gold or silver at a time, otherwise, CS-4 would have
15 to fill out the paperwork[31].  This shows that HILLARY BARTH is
16 coaching USPV/OLYMPIC GOLD & JEWELRY clients on strategies for
17 evading BSA reporting requirements.  It's important to note that
18 HILLARY BARTH had not previously met CS-4, because this suggests that
19 she gives this advice to *all* USPV/OLYMPIC GOLD & JEWELRY clients.

20      86.   On February 25, 2020, CS-4 went to USPV to access a
21 previously-rented box.  While there, CS-4 spoke to George VASQUEZ
22 about the possibility of purchasing gold.  This conversation was not
23 recorded, but was reported to the Affiant immediately after it
24 occurred.  VASQUEZ asked how much CS-4 wanted to purchase and CS-4
25 said he/she might have about $23,000 to invest.  CS-4 relayed to

26

27      [31] Note, CS-4 was not coached or prompted in any way to inquire
about breaking up a purchase. CS-4 was instructed to mention that
28 he/she expected to have $20,000 to invest and would like information
about purchasing gold or silver.

1   VASQUEZ what Hillary BARTH had previously told CS-4 -- that he/she

2   should keep the purchases under $10,000 in order to avoid doing

3   paperwork. VASQUEZ agreed with that and told CS-4 that he could help;

4   specifically, CS-4 could deposit $9,000 and give the rest to VASQUEZ,

5   who would make the deposits, so no paperwork would be filed. VASQUEZ

6   added that CS-4 should "throw me a little," meaning of the cash

7   because "I help you, you help me." VASQUEZ said he had such an

8   arrangement with someone else and it worked well[32]. VASQUEZ also added

9   that CS-4 would not even have to put his/her name on the receipt for

10   the gold; he/she could just use initials, and that way no one would

11   know -- there would be no paperwork.

12          3.   STEVE BARTH and VASQUEZ instruct a customer to
                 structure gold purchases to avoid currency transaction
13               reports

14       87.   Similarly, on January 28, 2020, a DEA employee, posing as a

15   potential customer, went to USPV to discuss purchasing gold.  The

16   meeting was recorded and reviewed by investigators.  The DEA Agent

17   first told George VASQUEZ that he wanted to purchase $18,000 worth of

18   gold. VASQUEZ then advised the Agent that, "You can buy that but I

19   advised you to buy under 10 [$10,000]. Because if you're buying under

20   10 [$10,000], we don't have to do paperwork. No information is going

21   to IRS. So you could buy 9 [$9,000], and a couple days, come buy

22   another 9 [$9,000]."  VASQUEZ then logged on the computer and showed

23   the Agent the gold prices[33].  A few minutes later, STEVE BARTH arrived

24   _____

25       [32]   Note this conversation took place after the
     January/February gold purchase, discussed below, in which VASQUEZ was
26   "tipped" in cash for his assistance.
         [33]   The fact that VASQUEZ was able to go behind the counter of
27   OLYMPIC GOLD AND JEWELRY and log onto the computer led the Agent to
     believe that the VASQUEZ was an employee of both USPV and OLYMPIC
28   GOLD AND JEWELRY and/or the two businesses were essentially one.

**EXHIBIT A**
**79**

1   at the business. VASQUEZ introduced STEVE BARTH to the Agent and
2   departed the display room.  STEVE BARTH told the Agent that he sells
3   gold, silver, platinum and different types of gold. The Agent told
4   STEVE BARTH that he wanted to purchase $18,000 worth of gold. STEVE
5   BARTH advised the Agent, if someone gives you $10,000 or more there's
6   a form you have to fill out. "If you buy less than $10,000 then
7   there's no form."  The Agent then told STEVE BARTH that he didn't
8   have any problem with filling out the form. STEVE BARTH then told the
9   Agent that, "Some people don't want to alert the IRS or whatever, so
10  they keep it under, most people." STEVE BARTH then advised the Agent,
11  "If you like to, you can buy $9,000 one day and then $9,000 you
12  know." The Agent then asked STEVE BARTH if he could purchase $9,000
13  of gold in one day then do another $9,000 worth of gold the very next
14  day. Steve BARTH said, "Yes, you could do that."  Later, STEVE BARTH
15  added, "I recommend you stay under 10,000 in cash and then you could
16  just do some one day and a few days later you could do the other.
17  That's what I would recommend." STEVE BARTH then said, "Anytime,
18  there's more than 10,000 dollars in cash, they get suspicious, so
19  they want to know. You fill out the form and the form goes to the
20  government and even though, it's legitimate."

21       88.  In addition to coaching customers on methods for evading
22  BSA requirements, HILLARY BARTH violated 31 U.S.C. §5331 by failing
23  to file IRS Form 8300 after conducting a cash transaction at OLYMPIC
24  GOLD & JEWELRY.   On or about December 4, 2019, CS-1 purchased
25  jewelry from OLYMPIC GOLD & JEWELRY[34].  CS-1 and HILLARY BARTH
26
27
          [34] The purchase was not recorded, but CS-1 exchanged text
28  messages with HILLARY BARTH negotiating and leading up to the

                                   61

negotiated the sale for approximately $11,900. CS-1 paid for the jewelry in cash. HILLARY BARTH gave CS-1 a document certifying that the jewelry was authentic. However, HILLARY BARTH did not provide an invoice or obtain the information necessary to complete the Form 8300 (CS-1's identification, etc.). No Form 8300 was in fact filed, based on a database search for any Form 8300s filed (at any time) by either STEVE or HILLARY BARTH. I believe HILLARY BARTH is aware of the requirement to file Form 8300 for cash transactions in excess of $10,000 based on her discussions with CS-4 and others. Moreover, HILLARY BARTH's failure to provide CS-1 with a receipt, invoice or other paperwork suggests that the sale was "under the table" and that any income earned from the cash transaction was not declared to the IRS.

> **O.    USPV Principals Laundered Cash Represented to be Criminal Proceeds Through OLYMPIC GOLD & JEWELRY**

> 1.   January/February 2020 Gold Buy

89.   On or about January 29, 2020, CS-3 and TFO-UC (posing as an associate of CS-3) went to USPV to discuss the purchase of gold with cash purportedly derived from the sale of methamphetamine. The meeting was recorded and reviewed by investigators.

a.    After discussing the difference between gold coins and gold bars, CS-3 told George VASQUEZ that gold bars were more desirable for melting down, and mentioned that TFO-UC needed the gold bars as payment for a debt. CS-3 then asked VASQUEZ about crossing gold "down south" [Mexico]. VASQUEZ asked CS-3, "How much are you planning to take?" He then instructed CS-3 to, "Keep it under 10,"

---

purchase; investigators received and reviewed copies of the text messages.

62

**EXHIBIT A**
**81**

referring to the monetary value of $10,000 in cash, when purchasing gold. VASQUEZ then instructed CS-3 and TFO-UC to conduct two separate "orders" under the amount of $10,000 each, when purchasing the gold. CS-3 then asked VASQUEZ, "What do you mean?" VASQUEZ then continued, "Yeah, if you keep it under $10,000, there is no paperwork. That way you don't have to give no social security, no ID. All that shit goes to the IRS." At this time, CS-3 and TFO-UC simultaneously expressed their interest in conducting the gold purchase without having to fill out paperwork.

      b.   CS-3 stated, "Nah.. Nah.. Nah.. fuck that! This is all 'skante' money. I can't even fuck with that." VASQUEZ then reiterated, "Keep it under 10. You want to buy gold? Keep it under 10." Based on training and experience, TFO-UC recognized "skante[35]," to be street vernacular commonly utilized for crystal methamphetamine.

      c.   At this time, TFO-UC asked VASQUEZ, "Does she [HILLARY] know the get down?" TFO-UC was referring to HILLARY BARTH's understanding of the structuring of gold purchases under $10,000 to avoid any reporting paperwork. VASQUEZ responded, "Yeah.. Yeah.. Yeah.. She will tell you." VASQUEZ then referred to HILLARY BARTH'S husband, STEVE BARTH. CS-3 indicated that STEVE BARTH instructed them on purchasing under $10,000 of gold at a time to avoid paperwork during a previous phone conversation. VASQUEZ continued to instruct CS-3 and TFO-UC to "keep it under 10." CS-3 then asked VASQUEZ if

---

[35] The Urban Dictionary defines "skante" as slang for crystal meth. The DEA Drug Slang Code Words 2018 also defines "skante" as crystal meth.

63

1  HILLARY BARTH would question them in regards to where they obtained
2  the money. VASQUEZ responded by saying, "She don't need to know. She
3  ain't gonna ask you."

4          d.    TFO-UC then asked VASQUEZ what the turn-around was on
5  an order of gold. TFO-UC expressed to VASQUEZ he was under time
6  constraints. VASQUEZ indicated the gold would be ready by the
7  following morning, referring to January 30, 2020. TFO-UC stated he
8  needed to get the gold down to Mexico. VASQUEZ then asked, "You guys
9  are going to pay whoever you guys owe in gold? I am just curious."
10 CS-3 then explained to VASQUEZ, "I moved a bunch of skante, and I did
11 really good. The guy who fronted us is down south. He's gotta take
12 the paper back. We don't wanna go down with paper 'cause I got
13 pinched like that." VASQUEZ replied, "Right, so you'll take the
14 gold." CS-3 responded, "Gold, cause the fuckin' dog won't pick up on
15 it. VASQUEZ replied, "Right. Right. Whichever you like."

16          e.    Based my training and experience and a debrief of TFO-
17 UC, it was clear to TFO-UC that CS-3 was explaining to VASQUEZ that
18 the money was obtained by selling crystal methamphetamine.
19 Furthermore, CS-3 explained that the individual who sourced the
20 crystal methamphetamine was in Mexico, and expecting payment for the
21 crystal methamphetamine. CS-3 explained that TFO-UC was tasked with
22 paying the source of the methamphetamine, adding that CS-3 and TFO-UC
23 did not want to drive the bulk U.S. currency down to Mexico because
24 CS-3 had previously been detained transporting narcotic proceeds, and
25 lost the proceeds. Furthermore, CS-3 explained their desire to
26 convert the narcotic proceeds into gold to repay the outstanding drug
27 debt because the gold would more easily avoid detection by trained
28 narcotic detecting K9's utilized by law enforcement personnel.

64

**EXHIBIT A**
**83**

1     f.   Following the above referenced conversation, VASQUEZ
2  escorted CS-3 and TFO-UC to HILLARY BARTH, who was waiting at the
3  display of OLYMPIC GOLD AND JEWELRY.  TFO-UC told HILLARY BARTH he
4  wanted to convert $16,000 in cash into a gold purchase. TFO-UC stated
5  there were time constraints due to needing to get the gold bars
6  delivered. HILLARY BARTH expressed an ability to have the gold by the
7  following morning. HILLARY BARTH then went on to describe the
8  different types of gold product they offered and the current value.
9  HILLARY BARTH then explained, "Now up to $10,000 cash, uh, up to
10 that, uh, is not reportable. If you go, if you buy more than that
11 with cash, there is a form you need to fill out, the government
12 requires because they want to know where this cash is going. Uh, so
13 anything under ten thousand there is no paperwork to fill out except
14 that you're signing the purchase order for me, for my records. So
15 that I show I am making a buy for a client. Uh, if you want to do
16 your sixteen thousand all at once, uh, if you want to wire it, uh, I
17 don't believe you have to fill out that form. It's a cash buy. We
18 don't do credit, nobody would take a credit card or a check until it
19 clears for bullion."    HILLARY BARTH then explained for $10,000 TFO-
20 UC could buy approximately "six," referring to ounces of gold,
21 depending on what gold product TFO-UC was interested in purchasing.
22 TFO-UC expressed an interest in purchasing the gold bars.

23     g.   CS-3 asked HILLARY BARTH how long TFO-UC would have to
24 wait to conduct a second purchase of gold, following the initial
25 purchase of under $10,000. TFO-UC told HILLARY BARTH he was not
26 interested in filling out any paper work for the gold purchase.
27 HILLARY BARTH recommended waiting until "next week, a few days,"
28 adding, "it's not recommended, they say, don't come in every day."

65

**EXHIBIT A**
**84**

1  HILLARY BARTH went on to say, "what they look for is a pattern of
2  someone who with intention is trying to get around..." HILLARY BARTH
3  did not finish her sentence. Instead, she added, "I am just
4  disseminating information." During this communication, it was
5  apparent TFO-UC that HILLARY BARTH appeared uneasy with the
6  conversation. HILLARY BARTH consistently looked up and away from CS-3
7  and TFO-UC. Furthermore, HILLARY BARTH became selective in her word
8  choice, referring to "they" repeatedly when referring to the cash
9  transaction report process.

10         2.   VASQUEZ suggests splitting the $16,000 Cash Purchase
               between CS-3 and TFO-UC to avoid the $10,000 reporting
11             requirement

12         h.   During the conversation between HILLARY BARTH, CS-3,
13  and TFO-UC, VASQUEZ stood approximately five feet west of the Olympic
14  Gold and Jewelry display, listening to the transaction take place. As
15  HILLARY BARTH explained to keep the purchase under $10,000, she
16  advised TFO-UC he could purchase six gold bars for $9,840. TFO-UC
17  explained again, his time constraints to get all $16,000 worth of
18  gold delivered by Friday referring to January 31, 2020. At this time,
19  VASQUEZ motioned over to CS-3 to come talk to him. CS-3 approached
20  VASQUEZ, who in Spanish instructed CS-3 to have TFO-UC purchase "8"
21  referring to $8,000 in gold, and CS-3 purchase the other "8"
22  referring to $8,000 in gold. Thereby making two simultaneous
23  transactions by two parties that would both fall under the $10,000
24  threshold.

25         i.   CS-3 then returned to the display where BARTH was
26  explaining to TFO-UC that the purchase of nine gold ounce bars would
27  amount to approximately $14,760. She then reiterated if TFO-UC
28  conducted the purchase on one transaction "paper work," would have to

**EXHIBIT A**
**85**

1   be filled out. At this time, CS-3 motioned to TFO-UC to go and talk

2   to VASQUEZ. TFO-UC approached VASQUEZ, who instructed TFO-UC to split

3   the gold purchase into two separate transactions of $8,000. While

4   TFO-UC was speaking with VASQUEZ, HILLARY BARTH was explaining to CS-

5   3 that any cash transaction over $10,000 would require the cash

6   transaction report. HILLARY BARTH further explained, the cash

7   transaction report was the result of the Patriot Act. She added, she

8   "never" utilizes the cash transaction reporting form because her

9   clients do not typically purchase greater than $10,000.

10          3.   HILLARY BARTH agrees to the structuring so long as CS-
                 3 and TFO-UC hand her the cash separately
11

12          j.   At this time, TFO-UC returned and asked HILLARY BARTH

13   if he could split the purchase into two separate transactions

     conducted separately by TFO-UC and CS-3. TFO-UC proposed that he
14
     could purchase five gold bars and CS-3 could purchase four gold bars.
15
     HILLARY BARTH indicated she would have to inquire to confirm if she
16
     was capable of conducting such a transaction. She then proceeded to
17
     operate her cellular phone through text messaging. She then stated,
18
     "Yes, as long as you hand me the money," meaning separately. She then
19
     explained she would fill out a receipt for the two separate
20
     transactions, which would only require a first name and last initial.
21
     HILLARY BARTH stressed the receipt was only for internal bookkeeping.
22
            k.   CS-3 then asked if he/she would have to be present to
23
     pick up the gold bars. HILLARY BARTH explained it would be okay for
24
     TFO-UC to take possession of the total purchase by presenting both
25
     receipts.  HILLARY BARTH explained to TFO-UC that he would have to
26
     sign the receipts at the time of pick up. Following the agreement to
27
     conduct the purchase of $14,760 worth of gold in two separate orders,
28

**EXHIBIT A**
**86**

1  HILLARY BARTH suggested they conduct the transaction in the back
2  office for "privacy."

3        l.   At this time, HILLARY BARTH, TFO-UC, CS-3, and VAZQUEZ
4  entered the back office.  Once inside the office, TFO-UC sat next to
5  HILLARY BARTH to conduct the first gold purchase. HILLARY BARTH
6  advised TFO-UC the first transaction of six one ounce Suisse bars
7  would total $9,843. TFO-UC retrieved 99 one hundred dollar bills in
8  U.S. currency ($9,900) of Official Advanced Funds (OAF) from a black
9  backpack and handed it to HILLARY BARTH as payment for the gold bars.
10 HILLARY BARTH placed the U.S. currency in a money counter and
11 confirmed the total. HILLARY BARTH then asked TFO-UC for a first name
12 and last initial for a hand written receipt for the transaction. TFO-
13 UC advised BARTH his name was, "Andres V."  HILLARY BARTH proceeded
14 to hand write a receipt for the purchase (ORDER # 1001). HILLARY
15 BARTH then instructed TFO-UC to sign the "received by," section of
16 the handwritten receipt. TFO-UC then initialed "AV" in cursive
17 writing.

18       m.   For the second transaction, CS-3 sat down in the chair
19 closest to HILLARY BARTH. HILLARY BARTH advised CS-3 that the
20 transaction of three one ounce Suisse bars would total $4,920. TFO-UC
21 retrieved 61 one hundred dollar bills in U.S. Currency ($6,100) of
22 OAF from a black backpack and handed it to CS-3 in plain and direct
23 sight of HILLARY BARTH. At this time, CS-3 asked TFO-UC, "How much is
24 it?" TFO-UC responded, "61," referring to $6,100 in U.S. currency.
25 CS-3 then removed 11 one hundred bills in U.S. currency ($1,100) from
26 the OAF and handed it back to TFO-UC. CS-3 then handed HILLARY BARTH
27 50 one hundred dollar bills, ($5,000) as payment for the three gold
28 bars. HILLARY BARTH placed the U.S. currency in a money counter and

68

**EXHIBIT A**
**87**

1  confirmed the total. HILLARY BARTH then asked CS-3 for a first name
2  initial and last name for a hand written receipt for the transaction.
3  CS-3 advised HILLARY BARTH to write, "D.Rossi." HILLARY BARTH
4  proceeded to hand write a receipt for the purchase (ORDER # 1002).
5  HILLARY BARTH did not instruct CS-3 to sign the "received by" section
6  of the handwritten receipt. CS-3 then handed the receipt to TFO-UC in
7  direct and plain sight of HILLARY BARTH.

8       n.   TFO-UC confirmed with HILLARY BARTH that he, alone,
9  would be picking up the full order of gold the following day, January
10 30, 2020. HILLARY BARTH confirmed the entire order, nine gold Suisse
11 bars, would be available for pick up before 12:00 p.m. The following
12 day, January 30, 2020, TFO-UC received nine ounces of gold bullion
13 from HILLARY BARTH at USPV.

14     87.  On February 5, 2020, TFO-UC returned to USPV and
15 compensated George VASQUEZ for his assistance in facilitating the
16 gold deal the previous week. TFO-UC gave VASQUEZ $1000 cash and
17 said, "This is for you man. I appreciate you walking us through that
18 shit. It worked out fucking perfect, so uh . . . we'll probably do
19 it again." TFO-UC suggested that he might conduct another gold
20 transaction soon. VASQUEZ said he would let the BARTHS know ahead of
21 time. TFO-UC said, "Just as long as I keep it under—" and VASQUEZ
22 interjected, "Yeah, yeah. Keep it under 10. And if you have to, do
23 it twice. Now let's say you need more than 10, but you're by
24 yourself. Come in. Call me and say, "Hey George, I am gonna need
25 15. Give me whatever, what else. Break it in half. Give me half.
26 And I'll have her buy it for me, and then I'll give it to you right
27 there."

28

**EXHIBIT A**
**88**

**P.    VASQUEZ and STEVE BARTH Arrange to Launder Cash for Wire Transfers for CS-3 for 15%**

90.    In October 2020, CS-3 approached VASQUEZ about conducting a second gold purchase through OLYMPIC GOLD & JEWELRY.  CS-3 stressed to VASQUEZ that while he/she was cool with the earlier transaction, it had "too many moving parts" and he/she was looking for something simpler.  CS-3 met VASQUEZ on or about October 8, 2020 to discuss this.  The meeting was recorded and reviewed by investigators, which showed:

a.    During the meeting CS-3 suggested to VASQUEZ that he/she provide VASQUEZ with the total amount of cash CS-3 wanted to use to purchase gold and VASQUEZ could structure the cash payment (under $10,000) over multiple days, on behalf of CS-3, so that CS-3 did not have to go to USPV multiple times in the same week.  VASQUEZ agreed to this saying, "that's my point, I don't want you to have to go all the time."

b.    CS-3 then said, "you don't even have to go get it. Just cut me a receipt that I purchased it, and then tax me whatever the fuck it is," i.e. charge a fee for converting the cash into a clean financial transfer.  VASQUEZ replied, "run that by me again. Do you want the gold or not?"  CS-3 indicated that he/she did not want the gold.  "I just want the receipt and then I sell it back to you, and you take your cut however it is."  CS-3 asked if this was possible, and VASQUEZ said, "Maybe."  He later added ". . . maybe, but I'm not sure.  I will have to talk to Steve, Hillary's husband." As noted elsewhere STEVE BARTH and HILLARY BARTH own and run OLYMPIC GOLD & JEWELRY.  CS-3 told VASQUEZ to "find out (from STEVE BARTH) and get back to me."

70

**EXHIBIT A**
**89**

1        c.    CS-3 and VASQUEZ continued discussing the proposed
2 deal and VASQUEZ clarified, "you just want to clean it." CS-3
3 replied, "that's exactly what it is." CS-3 added that he/she did not
4 want to continue laundering money through casinos, auctions and car
5 dealerships. VASQUEZ said, "Let me talk to Steve (BARTH), I don't
6 know, cause Steve is – as much as he can–" CS-3 said, "I get it," and
7 indicated that if they had to do it the way they did last time
8 (referring to the February 2020 transaction) that was fine, but "it's
9 about moving parts."

10        d.    Later in the conversation, VASQUEZ suggested CS-3
11 speak to Steve BARTH. CS-3 indicated that he/she preferred VASQUEZ
12 to speak to STEVE BARTH on his/her behalf. Your Affiant believes
13 this indicates that the decision to launder CS-3's money is STEVE
14 BARTH's decision and that VASQUEZ is subordinate to BARTH.

15        e.    VASQUEZ and CS-3 continued to discuss details such as
16 the percentage that CS-3 would be charged, whether CS-3 would receive
17 one check or multiple checks. VASQUEZ stated that the purchases
18 would have to be "under ten total. . . . I mean no paperwork and all
19 that stuff." CS-3 confirmed that the transaction would not be
20 reported. VASQUEZ said, "they have to at least take your first name
21 down." VASQUEZ added that he would "talk to Steve. I won't talk to
22 Hillary." Finally, VASQUEZ concluded, "we can do it. I think we
23 can. We do it that way a couple of times and it helps you out. We
24 all make a little bit."

25        f.    As the meeting was wrapping up, VASQUEZ said, "I will
26 talk to Steve." CS-3 said, "if you can do me a favor, just try to
27 fucking wash my shit." VASQUEZ said he would try.

28

<center>71</center>

<center>**EXHIBIT A**
**90**</center>

91.   On or about November 12, 2020 CS-3 met with VASQUEZ at USPV to confirm the previously-discussed money laundering operation.  The meeting was recorded and reviewed by investigators.  During the meeting, CS-3 indicated that the money would be ready the following week, and they discussed the date and time for the transaction.  They also discussed the percentage which would be charged and VASQUEZ stated he still needed to talk to Steve (BARTH) to finalize that aspect.  As VASQUEZ walked CS-3 to the door, CS-3 told VASQUEZ he/she appreciated the arrangement because he/she just sold a large load of "skante" for some people down south and he/she needed to clean the money as soon as possible.  VASQUEZ told CS-3 not to worry about it and it would be taken care.

92.   On or about November 17, 2020 CS-3 and TFO-UC went to USPV with $25,000 U.S. currency.  They met with VASQUEZ.  The meeting was recorded and reviewed by investigators.  The following took place:

a.   CS-3 asked VASQUEZ what percentage of the $25,000 would OLYMPIC GOLD AND JEWLERY charge, if they laundered all $25,000 at one time. VASQUEZ stated approximately 12 percent. CS-3 and TFO-UC initially balked at such a high percentage being charged. VASQUEZ replied by saying, "Well, first, we are not even supposed to be doing this, right? Second . ."  VASQUEZ then stopped talking and utilized a calculator to determine the amount of money OLYMPIC GOLD AND JEWLERY would charge at a 12 percent rate. VASQUEZ then stated, "it's about three grand. We are going to go with 12 percent at this time, because we are going to have to go buy it (referring to the gold bullion)." VASQUEZ then inquired if CS-3 and TFO-UC were still interested in conducting the laundering of the $25,000.  TFO-UC told VASQUEZ that he still wanted to do the transaction.

72

**EXHIBIT A**
**91**

b.    TFO-UC then retrieved the $25,000 from a backpack and handed it to VASQUEZ. VASQUEZ took possession of the U.S. currency and placed it in a money counter on his desk. Upon verifying the amount of $25,000, VASQUEZ remained in possession of the money. VASQUEZ inquired if TFO-UC wanted a receipt for the transaction. TFO-UC said that he did not want any paperwork at all.

c.    VASQUEZ then went on to explain based on the daily fluctuation of the price of gold and that they won't know exactly how much the business may earn and / or lose when purchasing and reselling the gold bullion, which is why Steve [BARTH] is charging 12 percent for the transaction[36]. VASQUEZ explained that OLYMPIC GOLD AND JEWLERY would utilize the $25,000 to purchase gold bullion, in multiple structured purchases under $10,000 to avoid mandated reporting paperwork. VASQUEZ stated once the gold bullion is purchased from a third party source, OLYMPIC GOLD AND JEWLERY would then "sell" the gold bullion, and wire the transaction amount to an account belonging to CS-3. CS-3 and TFO-UC expressed to VASQUEZ they did not want to touch nor see the gold bullion, and were only

---

[36] CS-3's initial understanding of the deal, based on conversations with VASQUEZ (which were not recorded) was that CS-3 would give the cash to VASQUEZ who would give it to BARTH, who would disguise the placement of the funds into the OLYMPIC GOLD AND JEWELRY business account as legitimate precious metals sales. VASQUEZ told CS-3 that STEVE BARTH would structure the funds to avoid reporting requirements and disguise the transactions on paper as anonymous gold and silver purchases. VASQUEZ assured CS-3 that no gold would actually change hands. VASQUEZ further told CS-3 that once the money had been structured into the OLYMPIC GOLD AND JEWELRY business account that a wire transfer, or series of wire transfers could be utilized to return the money to CS-3 into a bank account that CS-3 would provide VASQUEZ. VASQUEZ told CS-3 that the wire transfer would be made to look like a sale of precious metals to OLYMPIC GOLD AND JEWELRY. VASQUEZ told CS-3 that the entire circle of transactions would exist on paper only and would be clean and disguised as normal commerce.

73

**EXHIBIT A**
**92**

1   interested in a time frame in which they could expect the money to be
2   wired to the account.  VASQUEZ stated he understood and gave an
3   approximate two week time frame for the approximate $22,000 to be
4   wired to the account.  VASQUEZ explained the time frame depended on
5   how much bullion was in stock at OLYMPIC GOLD AND JEWLERY and how
6   much would have to be purchased from the third party source. VASQUEZ
7   further stated he could only conduct one cash purchase of gold
8   bullion under $10,000 a day and that OLYMPIC GOLD AND JEWLERY is only
9   open twice a week.

10          d.   CS-3 then provided VASQUEZ with account information to
11  receive the wire transfer.  VASQUEZ then inquired if TFO-UC wanted
12  the $3,000 charge to come out of the $25,000 that he just handed
13  VASQUEZ, or did he want to pay that separate, so that VASQUEZ knew
14  how to structure the purchases.  CS-3 and TFO-UC advised VASQUEZ to
15  take the 12 percent charge ($3,000) out of the $25,000 that TFO-UC
16  just handed VASQUEZ.  VASQUEZ acknowledged he understood and
17  indicated he would be in contact with CS-3 about updates.

18          e.   As TFO-UC and CS-3 were leaving USPV, CS-3 handed
19  VASQUEZ $500 for facilitating the transaction.   VASQUEZ accepted the
20  money.

21          f.   On or about December 2, 2020 CS-3 went to USPV to ask
22  VASQUEZ when CS-3 would see the money.  This meeting was not
23  recorded, but CS-3 reported it to investigators the same day, and
24  also provided a "screen shot" of a later communication which
25  corroborated his account, discussed below.  During the meeting,
26  VASQUEZ told CS-3 he needed the address on CS-3's bank account
27  because Steve BARTH needed it to complete the wire transfer.  CS-3
28  provided the information to VASQUEZ.  Later that day, CS-3 received a

1  text message from VASQUEZ with a picture of a computer screen.  On
2  the screen CS-3 saw a tracking number - 0W0001073359382 and the words
3  "bullion purchase" and "pending."  Agents have preserved and reviewed
4  the photo which VASQUEZ sent.  In the photo, agents observed a
5  reflection of VASQUEZ looking over the shoulder of someone who
6  appears to be STEVE BARTH.

7      g.  VASQUEZ advised that the first wire transfer was for
8  $10,000.  The rest would follow.

9      h.  On December 4, 2020 agents received confirmation that
10 two wires, one for $10,000 and one for $12,000 had been wired into
11 the under-cover bank account which was being utilized for this
12 operation.

13     **Q.  USPV Principals Help Its Customers Evade Law Enforcement**

14     95.  During the period of time in which CW-1 rented safe deposit
15 boxes at USPV (2012-2015), federal agents were investigating CW-1 and
16 contacted MARK PAUL about CW-1's boxes.  According to CW-1, PAUL told
17 CW-1 that he stalled in replying to the FBI and instructed GEORGE
18 VASQUEZ to "slow down in order to alert people."  PAUL specifically
19 told CW-1 to get his/her stuff out of USPV because the FBI had come
20 by.  Furthermore, PAUL told CW-1 to call another USPV customer whom
21 CW-1 had referred, to tell that customer to remove the contents of
22 his boxes quickly before the FBI could execute warrants.

23     96.  On August 9, 2019, USPV manager GEORGE VASQUEZ counseled
24 CS-3 on how to evade law enforcement.  During a recorded conversation
25 between VASQUEZ and CS-3, VASQUEZ said, "Piece of advice for you.
26 You know where you keep that [USPV safety deposit box] key, here?
27 [indicating under his shirt on a chain around his neck] . . . Called,
28 uh, asset forfeiture.  You ever heard about that?"  CS-3 said, "No,

<div align="center">75</div>

<div align="center">**EXHIBIT A**

**94**</div>

1  what?" VASQUEZ explained, "Well. Let's say you get pulled over for a
2  [unintelligible], right? Cop checking you out, things like that.
3  Hey, empty your pockets. They see your key, they know it's a safe
4  deposit box. They don't know where. But then, they escalate it
5  towards – they'll call someone from their department, say hey, you
6  know what, we got this guy for whatever, whatever. . . . And then
7  they start looking in to things. You know, and then they'll say, oh
8  well, we'll confiscate whatever you have, this and that, and then
9  they'll scare you and say hey, you know, you don't tell us where this
10  key belongs to, you know, you're gonna do twenty, fifteen years."
11  Later in the conversation, VASQUEZ added, "It's happened before.
12  Just to let you know. . . . Yeah, just to give you a heads up.
13  That's why we—we make sure we – I take care of our people, man."
14  Based on my training and experience as well as a comprehensive
15  debrief of CS-3, I believe that VASQUEZ was coaching CS-3 on how to
16  evade law enforcement.
17      97.  On August 30, 2019, CS-3 spoke to USPV manager GEORGE
18  VASQUEZ.  The conversation was recorded and reviewed by
19  investigators.  During the conversation VASQUEZ coached CS-3 on how
20  to evade law enforcement.  VASQUEZ said, "Like I told you. Be
21  careful when you go out. This is between us. Mike [POLIAK]—you know
22  he—he saw somebody get pulled over." CS-3 asked, "Is it hot here or
23  what? Should I be worried?" VASQUEZ replied, "No, no, no. No it's
24  just the people that do stuff." CS-3 asked, "They get followed in?"
25  VASQUEZ replied, "Yeah! They're fuckin' stupid. You know. Not,
26  not, not the place itself." Later in the conversation, CS-3
27  remarked, "You got to tell everybody to fuckin', shit, fuckin' watch
28  their back." VASQUEZ replied, "I tell everybody . . . I take care of

76

**EXHIBIT A**
**95**

1  people, man." Later VASQUEZ, discussing a person who was pulled over

2  and then let go said, "But it's just that I tell them, even though

3  they let him go, like, why did they pull you over in the first place?

4  Has to be a reason . . . Cause you did something fuckin' stupid . . .

5  And one other guy said oh he had tinted windows – too tinted. One

6  didn't have a fuckin' front license plate . . . Little shit." CS-3

7  agreed, saying, "They'll find something to fuckin' jam you up and

8  then they find something and from that they run." VASQUEZ replied,

9  "That's what I tell them, *perro*! But what do I know? Right?"

10      98.   In July 2019, CS-3 was at USPV. While there, George

11  VASQUEZ showed CS-3 the USPV security monitors and pointed out a

12  number of vehicles which VASQUEZ said he believed belonged to law

13  enforcement. VASQUEZ, in fact, identified a number of law

14  enforcement vehicles which were in the area due to CS-3's presence

15  there. VASQUEZ explained to CS-3 that he looks for vehicles parked

16  in one spot too long; vehicles which park, but no one exits; tinted

17  windows; and other factors.

18      99.   On or about October 21, 2020, George VASQUEZ explicitly

19  warned CS-4 that law enforcement officers were asking about him/her

20  and that he/she should remove the contents of his/her box. The

21  meeting between VASQUEZ and CS-4 was recorded and reviewed by

22  investigators.

23          a.   Specifically, on or about October 16, 2020 local law

24  enforcement officers went to USPV and represented themselves to be

25  narcotics investigators seeking information about a person they

26  asserted they had followed to USPV. The officers presented VASQUEZ

27  with a photograph of CS-4. VASUQEZ first indicated that he could not

28  give information about clients. As the officers were leaving,

77

**EXHIBIT A**
**96**

1 however, VASQUEZ walked them out and stated that he had seen the
2 person in the photo at USPV. He added that customers often remove
3 the contents of their boxes and never return.

4       b.    Shortly after the local law enforcement officers left
5 USPV, VASQUEZ contacted CS-3, who had talked about coming to USPV to
6 see VASQUEZ that day. Using coded language and communicating via
7 text message, VASQUEZ told CS-3 not to come, that the area was "hot"
8 right now.

9       c.    On or about October 19, 2020, CS-4 sent VASQUEZ a text
10 message indicating that CS-4 intended to pay rent on his/her box that
11 week. VASQUEZ replied via text message and told CS-4 to delete all
12 text communications between them. This communication has been
13 reviewed and preserved.

14       d.    On October 21, 2020, CS-4 went to USPV to pay
15 quarterly rent on his/her box. VASQUEZ spoke to CS-4 in the office[37]
16 area and coached him/her through a dialogue whereby VASQUEZ said,
17 "Pay close attention, okay? Pay attention. It's going to be $5,000."
18 CS-4 expressed surprise and confusion. VASQUEZ said, "Yes. Pay
19 attention. You say it's too expensive and you'd rather not do
20 business with me. Okay?" CS-4 was confused by this charade, but
21 followed VASQUEZ's instructions. When CS-4 asked why, VASQUEZ said,
22 "I'm doing you a favor, man. . . . I'm doing you a favor, dude,
23 don't say anything. Okay?" VASQUEZ added, "When you leave here,
24 delete my number. I'm doing you a favor, okay? If you want to go in
25 the bathroom and leave something for me, that's fine." CS-4

26
27
28    [37] Conversations between CS-4 and VASQUEZ occurred in Spanish.
Calls were translated into English by Spanish-language translators
working on behalf of the FBI.

**EXHIBIT A**

1  continued to press for an explanation.  VASQUEZ said, "I'm telling
2  you, the heat is hot.  . . . Things are hot here, I want you to
3  cancel your box.  . . . They're after you, man."  CS-4 asked, "Who?"
4  VASQUEZ replied, "The cops, dude."  CS-4 asked whether he/she could
5  rent a box later.  VASQUEZ said, "Another day, later on.  While
6  things clam down. . . . I'm doing you a favor.  They'll come again.
7  . . .  They showed me your photo and everything, so."  CS-4 asked,
8  "And the owners are the ones who made the decision?"  VASQUEZ said,
9  "No, man.  I'm making it, to protect you, man. . . . I'm just telling
10  you because if they come here, they're after you.  Okay? . . .
11  They're going to come.  They already said that when they're after
12  you, they're going to come back."  CS-4 asked again about renting a
13  box later.  VASQUEZ concluded with "I know, dude.  They're looking
14  for you.  I don't know.  The cops are looking for you, for real.  I'm
15  not going to lie to you."  CS-4 agreed and left.  Conversations
16  between VASQUEZ and law enforcement, as well as CS-4 were
17  consensually recorded and reviewed.  Text messages have been reviewed
18  and preserved.

19        e.   On November 12, 2020, VASQUEZ related these events to
20  CS-3, as well[38].  This communication between VASQUEZ and CS-3 was
21  recorded and reviewed by investigators.  During that conversation,
22  VASQUEZ described how the police had come to USPV looking for a USPV
23  customer (CS-4).  VASQUEZ speculated that the police had stopped the
24  customer and found his/her key or followed him/her to USPV.  VASQUEZ
25  assured CS-3 that he/she shouldn't worry about it, as the police had
26  not returned.

27

28
────────────────────
    [38] CS-3 and CS-4 are completely unknown to each other.
                    79

**EXHIBIT A**
**98**

1      100. Based on discussions Michael POLIAK had with CS-1, it
2   appears part of his motivation in buying into USPV was to protect
3   both his own money, and that of his "friends." In a December 2019
4   meeting which was recorded and reviewed by investigators, POLIAK told
5   CS-1, "the reason why I wanted to buy it [USPV], I got a lot of
6   fucking money now.  Not only – I don't just want to be a customer, I
7   wanted to be the owner . . . cause that way, if anything fucking
8   happens, I know first.  And it's good for all my customers that I
9   know first.  Cause I'm not Mark [PAUL]."  CS-1 said, "You see, I
10  mean, you only yourself have what, ten million, eight million?"
11  POLIAK said, "Yeah."  CS-1 continued, "And your friends?"  POLIAK
12  replied, "A lot."  CS-1 said, "Think about that. Your friends.  . . .
13  It's your ass.  It's your friends."  CS-1 said, "Worry-wise I don't
14  care, but again, you have to have your eyes in there because you have
15  to monitor their money,  But if you're a client—"  POLIAK added, "But
16  it's also – how many people trust anybody with that kind of money?
17  Anonymously?  **I mean, it's not like we're Chase Bank.  . . . So why**
18  **do they come?**  Cause of me. They're like, Mike {POLIAK]?  You're
19  there, okay.  I'm good with that." This exchange suggests that POLIAK
20  anticipates being able to warn his "friends" if there is some reason
21  their money is in jeopardy.

22      101. On or about September 16, 2020, in a conversation which was
23  recorded and reviewed by investigators, Michael POLIAK told CS-1 that
24  he would remove all but $5,000 of the contents of a client's box, for
25  that client, if he became aware of pending legal process.
26  Specifically, POLIAK and CS-1 were talking about having "a guy like
27  me [POLIAK]" watching customers' money. POLIAK indicated that if
28  someone had a problem he would "move it to another box. . . .  I

80

**EXHIBIT A**
**99**

1  would leave like five grand in the box.  . . .  Five grand.  Take it.
2  See you later. At least they can't say 'Oh, it was empty.'"  POLIAK
3  then told CS-1 about agents from Homeland Security who came to USPV
4  with a subpoena.  POLIAK said the agents showed a picture of the
5  person whose box they were interested in, but POLIAK told them that
6  USPV has no information about who holds which box and the agents
7  needed to bring the person to USPV, physically, to have his eye
8  scanned.

9      **R.**   **It Would Be Irrational for Non-Criminal Customers to Choose
10        USPV**

11     102.    As suggested above by USPV owner POLIAK, there is no
12 reason for non-criminal clients to use USPV, whose selling points
13 are: anonymity, instructions on how to structure cash transactions to
14 evade cash reporting requirements, tips on how to avoid asset
15 forfeiture, and ownership and management by drug traffickers.
16 Legitimate customers need not pay to store cash, but can receive
17 interest and insurance by depositing it in a money market or other
18 financial account.  Only those who wish to hide their wealth from the
19 DEA, IRS, or creditors would instead chose to *pay* to store actual
20 cash at a single storefront operation owned by the likes of MARK PAUL
21 and MICHAEL POLIAK who might go bankrupt, close the business for any
22 reason, or steal their valuables and run off.  No organization stands
23 behind the boxes at USPV in the way that Chase Bank, which has a
24 nearly 150-year history and almost 200,000 employees, stands behind
25 its safety deposit boxes, to say nothing of its bank accounts, which
26 are insured by the FDIC.  As stated by USPV owner POLIAK, it is his
27 standing among drug traffickers, as well as USPV's criminal-friendly

28

81

**EXHIBIT A**
**100**

1 | policies, that entice criminals to store their millions in cash, as
2 | described earlier in the previous forfeitures section, at USPV.

3 | **S.   USPV Falsely Claims It Either Returns the Unclaimed**
  | **Contents of Boxes to a Designee, or Escheats it to the**
4 | **State.**

5 | 103. On its company website USPV claims that the contents of
6 | unclaimed boxes will be turned over to a designee or to the State of
7 | California. Specifically, under "Frequently Asked Questions – What
8 | happens to the contents of my box if I die or become physically or
9 | mentally incapacitated?" – USPV states,

10 | "You should provide your attorney, beneficiary, or custodian
11 | with information about the existence of your box (for an example
12 | letter, visit our Customer Resources page). However, knowledge
13 | of the existence of your box does not constitute permission to
14 | access it. USPV will require a court authorization letter to
15 | release the contents of your box to ANYONE other than the
16 | renter.

17 | "If you choose not to provide this information, USPV will open
18 | your box due to nonpayment of rent (after a six month grace
19 | period has elapsed). If you have provided contact information
20 | within your box (suggested), USPV will attempt to locate you. If
21 | no contact information is found, we will store the contents of
22 | your box in our private safe for three years. Thereafter, we are
23 | required to escheat (forward) the contents to the State of
24 | California."

25 | 104. USPV employee GEORGE VASQUEZ, made similar statements to
26 | FBI agents during an interview on or about July 1, 2016.
27 | Specifically, VASQUEZ told agents that if a client fails to pay for
28 | his/her safety deposit box for three months, USPV will drill out the

**EXHIBIT A**
**101**

lock and try to contact the client if they find identifying documentation on the box. If not, USPV will keep the contents on hold for three years and then forfeit it to the State of California.

105. CW-1 alleged that these assertions by USPV and its principals are false. CW-1 reported that he/she and another individual rented a USPV box to which CW-1 had both keys. CW-1 also paid all the rent and fees for the box. Furthermore, CW-1 affixed a sticker onto the box with instructions for CW-1's spouse or father to be contacted in the event that CW-1 failed to pay rent on the box. CW-1 has not paid rent on the box in five years because CW-1 is incarcerated. Neither CW-1's spouse nor father were ever contacted. The other person whose biometrics were used to rent the box has passed away. The U.S. government did not seize the contents of the box, and there is no record of the property being forfeited to the State of California (which should not have happened because a designee was identified). Thus it appears that USPV may have kept the contents of CW-1's box. Furthermore, statements MARK PAUL made to CW-1 support this, described below.

106. PAUL told CW-1 that in the event of non-payment, after allowing a grace period, PAUL would drill open the box, a process he said he would video record. In the absence of contact instructions, he would place the contents into his own safe deposit box. CW-1 reported that PAUL himself has several USPV boxes. CW-1 believes that PAUL keeps the contents of these boxes for himself. CW-1 believes that the USPV stated policy concerning unpaid rent is false.

### 1. USPV Has Never Escheated Property

107. Based on information obtained from the California State Controller's Office – Unclaimed Property division, USPV has never

**EXHIBIT A**
**102**

1  escheated property to the state[39].   USPV has been in business since
2  2012; discounting the six month and three year waiting periods, this
3  means that in approximately five years, no one who failed to identify
4  a contact person has ever 1) abandoned a box; 2) failed to pay rent
5  on a box; 3) been arrested; 4) been deported; 5) died; or 6) become
6  incapacitated.   This seems unlikely, particularly given the types of
7  customers using USPV, as described herein.   A more logical
8  explanation is that PAUL places the contents of abandoned boxes in
9  his own safe deposit box for the three-year waiting period, but never
10 releases them to the state.

11      **T.   NOTIFYING USPV CUSTOMERS HOW TO CLAIM THEIR PROPERTY**

12      108. The search and seizure warrants the government seeks list
13 the nests of safety deposit boxes at USPV among the items to be
14 seized.   These nests of safety deposit boxes are evidence and
15 instrumentalities of USPV's criminality.   The warrants authorize the
16 seizure of the nests of the boxes themselves, not their contents.   By
17 seizing the nests of safety deposit boxes, the government will
18 necessarily end up with custody of what is inside those boxes
19 initially.   Agents will follow their written inventory policies to
20 protect their agencies from claims of theft or damage to the contents
21 of the boxes, and to ensure that no hazardous items are unknowingly
22 stored in a dangerous manner.   Agents will attempt to notify the
23 lawful owners of the property stored in the boxes how to claim their
24 property, such as by posting that information on the internet or at

25

26      [39] I ran a search on the Unclaimed Property Website and spoke
    with a representative from the State Controller's Office, who also
27  ran a search.   Both searches revealed no results.   In other words,
    USPV has never escheated property to the State of California, as it
28  claims.

**EXHIBIT A**
**103**

1  USPV itself, or by contacting the owners directly.  In order to
2  notify the owners directly, agents will, in accordance with their
3  policies regarding an unknown person's property, look for contact
4  information or something which identifies the owner.[40]   (USPV
5  recommends that box renters include their or their designees'
6  telephone numbers on a note in the box in the event that USPV removes
7  the contents for nonpayment of rental fees.)

8  **U.   REQUEST FOR AFTER-HOURS SEARCH WARRANT FOR USPV LOCATION**
      **ONLY**
9
10      109.    I request permission to complete the search and seizure
11  warrants at the USPV location outside of normal searching hours.
12  Because that facility is secured and advertises that it is on a time-
13  lock, agents will not be able to begin executing any warrants there
14  until after its normal opening time, 10:00am.  Further, because it is
15  secured, I expect that removing some business equipment, especially
16  the nests of safety deposit boxes, will be unusually time consuming,
17  so that agents may not be able to complete their tasks before
18  10:00pm.  Accordingly, for the USPV location only, I request
19  permission for agents to continue executing search and seizure
20  warrants beyond 10:00pm.

21       **USPV OWNER MARK PAUL LIVES AT PAUL'S RESIDENCE**
22       110.  ████████████████████████████████████
23  ████████████████████████████████   ██████████████
24  ████████████████████████████████████████████████
25  ████████████████████████████████████████████████
26  ██████████████████████████████████████████████

27  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
28  [40] The FBI policy regarding taking custody of an unknown person's
   property provides, in part, that agents "inspect the property as
   necessary to identify the owner and preserve the property for
   safekeeping."  The inspection "should extend no further than
   necessary to determine ownership."

**EXHIBIT A**

1　
2
3
4
5　　　USPV OWNER MICHAEL POLIAK LIVES AT POLIAK'S RESIDENCE
6　　　111.
7
8
9
10
11
12
13
14
15　　　USPV MANAGER GEORGE VASQUEZ LIVES AT VASQUEZ'S RESIDENCE
16　　　112.
17
18
19
20
21
22
23
24
25　　　HILLARY AND STEVE BARTH LIVE AT THE BARTHS' RESIDENCE
26　　　113.
27
28

86

**EXHIBIT A**
**105**



9        **TRAINING AND EXPERIENCE ON THE SUBJECT OFFENSES**

10       114. In my training and experience, persons involved in money

11   laundering, drug trafficking, and structuring must maintain records

12   of their activities just to manage their day-to-day criminal business

13   affairs, and to keep track of their finances.  Commonly they maintain

14   both written and electronic records, usually on computers and smart

15   phones or tablets.  Typically they store these records where they

16   feel is safe and near at hand, most often their residences, places of

17   business, and vehicles.  Persons with illicit wealth often attempt to

18   hide it from the authorities by storing it in the form of cash,

19   precious metals, or digital currencies such as bitcoin.  Persons

20   involved in criminal conspiracies must of necessity maintain the

21   contact information of their co-conspirators in the form of telephone

22   numbers, email addresses, and user names for communication

23   applications, such as Signal, WhatsApp, and Facebook.  Most often

24   they maintain this contact information on their computers or smart

25   phones.

26       **TRAINING AND EXPERIENCE ON DIGITAL DEVICES**

27       115. Based on my training, experience, and information from

28   those involved in the forensic examination of digital devices, I know

87

1  that the following electronic evidence, inter alia, is often
2  retrievable from digital devices:

3       a.    Forensic methods may uncover electronic files or
4  remnants of such files months or even years after the files have been
5  downloaded, deleted, or viewed via the Internet.  Normally, when a
6  person deletes a file on a computer, the data contained in the file
7  does not disappear; rather, the data remain on the hard drive until
8  overwritten by new data, which may only occur after a long period of
9  time.  Similarly, files viewed on the Internet are often
10  automatically downloaded into a temporary directory or cache that are
11  only overwritten as they are replaced with more recently downloaded
12  or viewed content and may also be recoverable months or years later.

13       b.    Digital devices often contain electronic evidence
14  related to a crime, the device's user, or the existence of evidence
15  in other locations, such as, how the device has been used, what it
16  has been used for, who has used it, and who has been responsible for
17  creating or maintaining records, documents, programs, applications,
18  and materials on the device.  That evidence is often stored in logs
19  and other artifacts that are not kept in places where the user stores
20  files, and in places where the user may be unaware of them.  For
21  example, recoverable data can include evidence of deleted or edited
22  files; recently used tasks and processes; online nicknames and
23  passwords in the form of configuration data stored by browser, e-
24  mail, and chat programs; attachment of other devices; times the
25  device was in use; and file creation dates and sequence.

26       c.    The absence of data on a digital device may be
27  evidence of how the device was used, what it was used for, and who
28  used it.  For example, showing the absence of certain software on a

88

**EXHIBIT A**
**107**

1   device may be necessary to rebut a claim that the device was being
2   controlled remotely by such software.

3         d.    Digital device users can also attempt to conceal data
4   by using encryption, steganography, or by using misleading filenames
5   and extensions.  Digital devices may also contain "booby traps" that
6   destroy or alter data if certain procedures are not scrupulously
7   followed.  Law enforcement continuously develops and acquires new
8   methods of decryption, even for devices or data that cannot currently
9   be decrypted.

10    116. Based on my training, experience, and information from
11   those involved in the forensic examination of digital devices, I know
12   that it is not always possible to search devices for data during a
13   search of the premises for a number of reasons, including the
14   following:

15        a.    Digital data are particularly vulnerable to
16   inadvertent or intentional modification or destruction.  Thus, often
17   a controlled environment with specially trained personnel may be
18   necessary to maintain the integrity of and to conduct a complete and
19   accurate analysis of data on digital devices, which may take
20   substantial time, particularly as to the categories of electronic
21   evidence referenced above.  Also, there are now so many types of
22   digital devices and programs that it is difficult to bring to a
23   search site all of the specialized manuals, equipment, and personnel
24   that may be required.

25        b.    Digital devices capable of storing multiple gigabytes
26   are now commonplace.  As an example of the amount of data this
27   equates to, one gigabyte can store close to 19,000 average file size
28   (300kb) Word documents, or 614 photos with an average size of 1.5MB.

**EXHIBIT A**
**108**

117. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   Thus, the warrants I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress the thumb and/or fingers of MARK PAUL, MICHAEL POLIAK, GEORGE VASQUEZ, and HILLARY and STEVE BARTH on the device(s); and (2) hold the device(s) in front of those persons' faces with their

90

**EXHIBIT A**
**109**

1  eyes open to activate the facial-, iris-, and/or retina-recognition

2  feature.

3      118. Other than what has been described herein, to my knowledge,

4  the United States has not attempted to obtain this data by other

5  means.

6                              **CONCLUSION**

7      119. Based upon the foregoing facts and my training and

8  experience, I believe there is probable cause to believe that

9  evidence, fruits, and instrumentalities of the SUBJECT OFFENSES, as

10 listed in Attachment B, will be found at the SUBJECT PREMISES.  I

11 further respectfully submit that there is probable cause to believe

12 that the business computers, money counters, nests of safety deposit

13 boxes and keys, digital and video surveillance and security equipment

14 and biometric scanners located at USPV, 9182 West Olympic Blvd.,

15 Beverly Hills, CA 90212 were used or intended to be used to

16 facilitate violations of 18 U.S.C. § 1956, 21 U.S.C. § 841, and 31

17 U.S.C. § 5324, and conspiracy to commit the same.  As a result, those

18 items are subject to seizure and forfeiture to the United States

19 pursuant to 18 U.S.C. § 982(b)(1), 21 U.S.C. § 853(f) and 31 U.S.C.

20 § 5317(c).

21

22 Attested to by the applicant in accordance
   with the requirements of Fed. R. Crim. P. 4.1
23 by telephone on this __17__ day of March, 2021.

24

25

26 _____

27 STEVE KIM
   UNITED STATES MAGISTRATE JUDGE
28

                                91

                          **EXHIBIT A**
                             **110**